Latashia Pettiford v. Next Generation Trust Service, No. 34, September Term, 2019

**LANDLORD-TENANT LAW – SUMMARY EJECTMENT PROCEEDING – CONSENT JUDGMENT – DEFENSE UNDER IMPLIED WARRANTY OF HABITABILITY – DEFENSE UNDER RENT ESCROW STATUTES –** Court of Appeals concluded that tenant's motion to dismiss was properly denied. Court of Appeals held that judgment entered by trial court was not consent judgment, and, as such, tenant was not required to object to its entry to preserve for appellate review issues concerning judgment and merits of case, but rather could simply appeal, as she did. Judgment entered by trial court was not consent judgment because there was no agreement between parties as to resolution of issues in case, parties did not present any agreement to trial court, there was no consideration, and neither tenant nor her counsel consented to so-called consent judgment. Court of Appeals also held that trial court improperly precluded tenant from asserting and litigating defenses under implied warranty of habitability and rent escrow statutes, and that tenant was statutorily entitled to raise such defenses during summary ejectment proceeding and to have them fully considered.

Circuit Court for Baltimore City
Case No. 24-C-19-000329
Argued: December 9, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 34

September Term, 2019

_____

LATASHIA PETTIFORD

v.

NEXT GENERATION TRUST SERVICE

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Raker, Irma S. (Senior Judge,
Specially Assigned)

JJ.

_____

Opinion by Watts, J.
Barbera, C.J., and McDonald, J., concur.

_____

Filed: March 26, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This case involves a summary ejectment proceeding, under Md. Code Ann., Real Prop. (1974, 2015 Repl. Vol., 2018 Supp.) ("RP") § 8-401, initiated by Next Generation Trust Service ("Next Generation"), Respondent, a landlord, in the District Court of Maryland, sitting in Baltimore City, against Latashia Pettiford, Petitioner, alleging that Pettiford had failed to pay rent for five months (June through October 2018) and seeking repossession of the property. In the District Court, Pettiford moved to dismiss the complaint because Next Generation did not have a Baltimore City use and occupancy permit for the property following receipt of a violation notice from Baltimore City. The District Court denied the motion to dismiss. Pettiford attempted to assert defenses to summary ejectment, including breach of the implied warranty of habitability and a request for rent escrow. The District Court stated that, if the property was uninhabitable, Pettiford would not be permitted to stay in the property, "[s]o, she'll be out by midnight tonight if she wants to claim it's uninhabitable." Pettiford's counsel responded that, in "that case[,] we cannot."

The District Court addressed the amount of rent still owed and sent the parties to the hallway to discuss a possible resolution of the case. The parties returned to the courtroom having not arrived at a resolution, and the District Court stated that the trial would proceed. Next Generation's agent stated that the parties could not reach an agreement due to an issue with heat in the property. Pettiford's counsel confirmed, stating that Pettiford was seeking the right to rent escrow based on a lack of heat in the property that Pettiford had notified Next Generation about approximately nine months earlier. Pettiford addressed the District Court and confirmed that the furnace in the property was not working and she did not have

heat, and that she had told an agent of Next Generation about the issue. The District Court stated that the complaint alleged rent owed for June through October, when Pettiford "wouldn't have needed heat[,]" so Pettiford could "open [an] escrow for November[, b]ut [Next Generation was] not asking for November[,]" and Pettiford could "go to the [C]lerk's [O]ffice and open that for November."

The District Court next addressed the amount owed by Pettiford, who acknowledged owing rent for certain months. The District Court asked whether Pettiford "just said she owes July, August, September[,] and October that she didn't pay it, correct?" Pettiford responded: "Mmm-hmm." Immediately thereafter, the District Court stated: "Okay, then we'll do a consent judg[]ment[,]" and Next Generation's agent thanked the court. The District Court thanked the parties "for working it out" and wished them good luck. Pettiford's counsel thanked the court. The District Court modified the amount of the judgment to be consistent with the amount sought in the complaint, less a partial payment, stating an amount, and Next Generation's agent stated "[r]ight." Pettiford's counsel and Next Generation's agent thanked the court and the proceeding concluded.

Pettiford appealed on the record to the Circuit Court for Baltimore City, which affirmed the District Court's judgment. Pettiford filed in this Court a petition for a writ of *certiorari*, which we granted.

Against this backdrop, we decide whether the District Court properly denied the motion to dismiss. We decide whether the judgment entered by the District Court was a consent judgment and whether Pettiford failed to preserve an issue as to the judgment by not objecting to its entry. We also decide whether the District Court properly considered

- 2 -

Pettiford's defenses under the implied warranty of habitability and rent escrow statutes. We conclude that the motion to dismiss was properly denied. We hold that the judgment entered by the District Court was not a consent judgment, and, as such, Pettiford was not required to object to its entry to preserve for appellate review issues concerning the judgment and merits of the case, but rather could simply appeal, as she did. The judgment entered by the District Court was not a consent judgment because there was no agreement between the parties as to resolution of the issues in the case, no agreement was presented by the parties to the District Court, there was no consideration, and neither Pettiford nor her counsel consented to the so-called consent judgment. We also hold that the District Court improperly precluded Pettiford from asserting and litigating defenses under the implied warranty of habitability and the rent escrow statutes, and that Pettiford was statutorily entitled to raise such defenses during the summary ejectment proceeding and to have them fully considered. As such, we reverse the circuit court's judgment and remand the case to that court with instructions to vacate the District Court's judgment and to remand for further proceedings consistent with this opinion.

## BACKGROUND

Pettiford rents real property from Next Generation located on North Potomac Street in Baltimore City pursuant to a written lease agreement.

### District Court Proceedings

On or about November 13, 2018, Next Generation filed in the District Court a form complaint entitled "Failure to Pay Rent - Landlord's Complaint for Repossession of Rented Property [RP] §[ ]8-401." (Bolding and some capitalization omitted). In the complaint,

Next Generation alleged that Pettiford had not paid rent for five months—June, July, August, September, and October of 2018—and owed $5,339.64 in rental payments and late charges. In the complaint, Next Generation checked boxes next to "Yes" indicating that it, as the landlord, was "required by law to be licensed/registered to operate th[e] premises as a rental property" and that it was "currently licensed/registered[.]" Next Generation provided its license/registration number and stated that it had a valid inspection certificate from the Maryland Department of the Environment for the property.

On November 19, 2018, the parties appeared before the District Court. At that time, Pettiford's counsel advised that Pettiford had made a payment of $540 to Next Generation. Pettiford's counsel stated that Pettiford disputed the amount owed, though, and that she was attempting to file a preliminary motion to dismiss based on Next Generation's failure to obtain a use and occupancy permit following receipt of a violation notice from Baltimore City. The District Court stated that, if the property was not supposed to be occupied, a person would not be permitted to stay in the property, and Pettiford would need to leave. Pettiford's counsel provided the District Court with a notice for abatement that Baltimore City issued on November 13, 2018.[1] Next Generation's agent stated that Next Generation had not received the notice. The District Court observed that Next Generation had a registration number for the property from Baltimore City, and appeared to suggest that the lack of a use and occupancy permit would not be a defense if it were based on a mere

_____

[1]The notice stated that Baltimore City's Environmental Control Board was assessing a fine in the amount of $900 against Next Generation for failure to abate an unsafe structure notice that had been issued for the property.

- 4 -

technicality or issue with Baltimore City. The District Court stated that it could conduct a hearing, allow a short postponement, or dismiss the matter. Although Next Generation's agent stated that she wanted the District Court to conduct a hearing, the District Court postponed the case to November 30, 2018 to allow the parties to investigate the use and occupancy permit issue. Pettiford's counsel stated that Pettiford also had a rent escrow defense, and the District Court stated that that would need to be argued at the hearing.

On November 30, 2018, the parties appeared again before the District Court. Next Generation's agent stated that the remaining balance owed was $4,799.64. Pettiford's counsel stated that she had a preliminary motion to dismiss based on Next Generation's failure to abate a violation notice and obtain a use and occupancy permit. At that point, the District Court asked Pettiford's counsel if Pettiford wanted to leave the property, and Pettiford's counsel responded: "[N]o[.]" The District Court asked: "She wants to stay in what you're claiming is an unsafe property? . . . I can't let her do that." According to the District Court, the relevant statute stated that it needed to consider only whether Next Generation had filled out items two and three of the form complaint, concerning whether a landlord was licensed/registered to operate the premises as a rental property and whether, if required, there was a valid inspection certificate from the Maryland Department of the Environment for the property. Pettiford's counsel disagreed, contending that Next Generation was also required to obtain a use and occupancy permit to rent the property. Next Generation's agent stated that she had spoken with "Code Enforcement" and had been advised that, to file for a use and occupancy permit, Next Generation needed to pay $73. The District Court stated "this is a revenue[-]enhancing bill for [Baltimore] City[,]" and

denied the motion to dismiss.

Pettiford's counsel stated that Pettiford was asserting a defense based on the warranty of habitability, including a request for rent escrow. The District Court immediately responded: "Well[,] if it's uninhabitable[,] I'm not going to let her stay in it . . . [bec]ause[,] if something happens to her[,] and you've told me it's uninhabitable[,] it's on me. So, she'll be out by midnight tonight if she wants to claim it's uninhabitable." Pettiford's counsel stated that, in "that case[,] we cannot." Next Generation's agent asserted that the property had been renovated before Pettiford moved in, and claimed that Pettiford was asserting such a defense only because Next Generation had filed the complaint. The District Court noted that it had denied the motion to dismiss, and turned to the amount still owed. Next Generation's agent stated that Pettiford had paid $540. Pettiford's counsel requested to see a ledger, and the District Court sent the parties into the hallway to take a look at the ledger and discuss a possible resolution.

The parties returned to the courtroom and advised that they had not arrived at a resolution. The District Court stated that the trial would proceed. At that time, Next Generation's agent stated that the parties could not reach an agreement due to an issue with heat in the property. The District Court asked: "Well[,] this isn't an escrow case, right?" Pettiford's counsel responded that Pettiford was raising a rent escrow defense based on a heat issue in the property that Pettiford told Next Generation about in "February [2018] and months between[,]" and that Pettiford had not had working heat in the property since February and that, to date, she still did not have heat. Pettiford addressed the District Court and stated that the pipes in the property had been replaced, and that she had hot water, but

that the furnace was not working, and that Next Generation had not sent someone to light the furnace. Pettiford stated that she had been in contact with an individual at Next Generation about the fact that maintenance personnel had not come out to light the furnace. The District Court asked: "[S]o[,] this is only for June, July, August, September[,] and October? . . . When you wouldn't have needed heat. . . . So, you can open your escrow for November[, b]ut they're not asking for November." The District Court reiterated that Pettiford could "go to the [C]lerk's [O]ffice and open that for November."

The District Court addressed the amount owed by Pettiford, and the following exchange occurred:

> COURT: So, does she agree that she owes [$4,799.64] then for June, July, August, September[,] and October?
>
> [] PETTIFORD: No.
>
> COURT: You've [] paid June, July, August, September[,] and October's rent?
>
> [] PETTIFORD: I just made a payment on November the 15th[,] so that was the rest of June's. So, I owe for July, August, September[,] and October.
>
> COURT: Do you have a payment for June?
>
> [PETTIFORD'S COUNSEL]: Not for June, no.
>
> [NEXT GENERATION'S AGENT]: No, she made --
>
> [] PETTIFORD: It was made on November the 15th[,] so that's the rest of June's payment. So, I owe for July, August, September, [and] October.
>
> [PETTIFORD'S COUNSEL]: She paid [$540].
>
> [NEXT GENERATION'S AGENT]: Okay, so she's[] just backdating it?
>
> [PETTIFORD'S COUNSEL]: So, . . . from July, August, September --

[NEXT GENERATION'S AGENT]: Okay, well –

COURT: So, she agrees to [$1,200] times [4,] which is [$4,800,] and then[,] what is your late fee?

[NEXT GENERATION'S AGENT]: Our late fee is [$60].

COURT: So, [$240] late fee, so[,] she agrees to [$5,040,] and we'll cross June off[.  D]o you consent to that?

[NEXT GENERATION'S AGENT]: Yes.

COURT: She just said she owes July, August, September[,] and October that she didn't pay it, correct?

[] PETTIFORD: Mmm-hmm.

COURT: Okay, then we'll do a consent judg[]ment in the amount of [$5,040].

[NEXT GENERATION'S AGENT]: Thank you, Your Honor.

COURT: Thanks for working it out.  Good luck.

[PETTIFORD'S COUNSEL]: Thank you, Your Honor.

COURT: Oh wait, hold on.  That's actually more than what you amended --

[NEXT GENERATION'S AGENT]: Right, right.

COURT: Your complaint is.  So, we'll just, the max that we can give you is what you asked for.

[NEXT GENERATION'S AGENT]: Okay.

COURT: Which --

[NEXT GENERATION'S AGENT]: The [$4,700].

COURT: [$4,799.64].

[NEXT GENERATION'S AGENT]: Right.

- 8 -

[PETTIFORD'S COUNSEL]: Thank you, Your Honor.

[NEXT GENERATION'S AGENT]: Thank you, Your Honor.

The "DISPOSITION" portion of the form complaint indicated that the District Court entered "[j]udgment in favor of Landlord for possession of the premises and costs" and rent due and unpaid in the amount of $4,799.64. The "DISPOSITION" portion also included boxes next to options as to the type of judgment—default, trial, consent, and/or without the right of redemption—and the box next to "[c]onsent" was checked.

Pettiford filed a notice of an on-the-record appeal and a "Motion to Note Record Appeal, Set Appeal Bond[,] and Stay [] Execution of Judgment Pending Ruling." (Some capitalization omitted). In the motion, Pettiford requested that the appeal bond be set in an amount no greater than $4,799.64, the amount of rent and late fees that the District Court ruled was owed. Pettiford also requested that the November 30, 2018 judgment for possession be stayed pending a ruling on the motion and the opportunity for Pettiford to pay the appeal bond. On December 10, 2018, the District Court issued an order stating that the appeal would proceed on the record, setting the appeal bond in the amount of $4,799.64, and staying execution of the judgment of possession until December 24, 2018, to provide Pettiford an opportunity to pay the appeal bond.

**Circuit Court Proceedings**

On April 15, 2019, the circuit court conducted a hearing and held the matter under advisement. On April 18, 2019, the circuit court issued an order affirming the District Court's judgment and an accompanying memorandum opinion. In the memorandum

opinion, the circuit court concluded that the District Court properly entered a consent judgment, and that Pettiford was required to object to the entry of the judgment to preserve the issue for appellate review. The circuit court also determined that Pettiford was required to object to the District Court's decision to preclude the breach of the warranty of habitability defense.

## Proceedings in This Court

On May 23, 2019, Pettiford petitioned for a writ of *certiorari*, raising the following three issues:

> 1. Did the District Court err by failing to dismiss [Next Generation]'s summary ejectment complaint when [Next Generation] had not obtained, prior to renting the property to [Pettiford], a permit required by law for the property to be occupied?
>
> 2. Did the District Court err when it effectively denied [Pettiford] the opportunity to assert a warranty of habitability defense and denied [Pettiford]'s attempted rent escrow defense?
>
> 3. Did the [c]ircuit [c]ourt erroneously affirm the District Court's entry of a consent judgment after [Pettiford] raised multiple defenses, had not come to any agreement with [Next Generation], and neither party had requested entry of a consent judgment?

On August 26, 2019, this Court granted the petition. See Pettiford v. Next Generation Trust Serv., 465 Md. 665, 214 A.3d 1195 (2019).

On December 9, 2019, this Court heard oral argument. At oral argument, the parties addressed whether the holding in McDaniel v. Baranowski, 419 Md. 560, 563, 19 A.3d 927, 929 (2011) applies to Baltimore City use and occupancy permits, *i.e.*, whether a rental property owner is required to have a use and occupancy permit, when required, to initiate a summary ejectment proceeding. On December 13, 2019, this Court issued an order

- 10 -

inviting the Mayor and City Council of Baltimore and the Maryland Multi-Housing Association, Inc. to file amicus briefs "on the question of whether the Court's holding in *McDaniel* [] should be extended to [use and] occupancy permits required by Baltimore City[.]"[2]  According to the order, any amicus briefs were due by January 27, 2020, and any responses to the amicus briefs were due by February 18, 2020.

On January 24, 2020, the Mayor and City Council of Baltimore filed an amicus brief, arguing that the holding in McDaniel applies to Baltimore City use and occupancy permits, as well as Baltimore City's new rental property licensing scheme, which became effective on January 1, 2019, after the proceedings in the District Court in this case.  On January 27, 2020, the Maryland Multi-Housing Association, Inc. filed an amicus brief, arguing that the new Baltimore City rental property licensing scheme renders moot any need to expand McDaniel, and that, in any event, extending the holding in McDaniel to Baltimore City use and occupancy permits is both impracticable and redundant in light of the new licensing requirement.  On February 18, 2020, Pettiford filed a reply to the amicus briefs, contending that extending McDaniel to Baltimore City use and occupancy permits is not moot under the circumstances of this case, and that a landlord should have to plead and demonstrate a valid use and occupancy permit where required.

## STANDARD OF REVIEW

Maryland Rule 8-131(c) governs review of a bench trial and provides:

When an action has been tried without a jury, the appellate court will review

---

[2]At the time, the Legal Aid Bureau, Inc. had filed the only amicus brief in this case, contending that this Court's holding in McDaniel applies to Baltimore City use and occupancy permits.

the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

In Estate of Zimmerman v. Blatter, 458 Md. 698, 717-18, 183 A.3d 223, 235 (2018), "we explained the standard of review applicable under Maryland Rule 8-131(c)[,]" stating:

We give due regard to the trial court's role as fact-finder, and will not set aside factual findings unless they are clearly erroneous. The appellate court must consider evidence that is produced at the trial in a light most favorable to the prevailing party, and, if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous, and cannot be disturbed. Questions of law, however, require our non-deferential review. When the trial court's decision involves an interpretation and application of Maryland statutory and case law, this Court must determine whether the trial court's conclusions are legally correct. Where a case involves both issues of fact and questions of law, this Court will apply the appropriate standard to each issue.

(Cleaned up).

## DISCUSSION

### I.

In the District Court, Pettiford moved to dismiss the complaint, contending that Next Generation did not have a Baltimore City use and occupancy permit for the property following receipt of a violation notice from Baltimore City. The District Court denied the motion to dismiss. In this Court, Pettiford raised an issue concerning whether the holding in McDaniel, 419 Md. at 563, 19 A.3d at 929, applied to Baltimore City use and occupancy permits at the time that Next Generation initiated the summary ejectment proceeding. We conclude that, under this case's circumstances, the holding in McDaniel did not apply when Next Generation filed the summary ejectment action in November 2018.

In McDaniel, id. at 563, 19 A.3d at 929, this Court held "that a rental property owner who does not possess a current license to operate the premises[] is not entitled to utilize the summary ejectment procedures outlined in [RP §] 8-401 [] upon a tenant's failure to pay rent, if the dwelling is located in a jurisdiction that requires owners to obtain such licenses." In that case, concerning the rental of an apartment in a multiple dwelling unit in Anne Arundel County, the Anne Arundel County Code provided that a person could not operate a multiple dwelling unit without a license from the Department of Inspections and Permits, and that a separate license was required for each multiple dwelling unit. See id. at 564, 19 A.3d at 929. The license could not be issued without the approval of the Health Officer, who was to approve issuance of a license if inspection revealed compliance with the requirements of the Anne Arundel County Code, including that the dwelling was clean, sanitary, fit for human occupancy, and in compliance with the Code and other applicable State and county laws. See id. at 564-65, 19 A.3d at 929-30. We concluded that "[l]icensure under local ordinances in order to operate rental dwelling units is an integral part of a landlord's status as claimant in those jurisdictions that require licensure." Id. at 587, 19 A.3d at 943. As such, we held that, to invoke the summary ejectment process, "a landlord in those jurisdictions requiring licensure[] must affirmatively plead and demonstrate that he [or she] is licensed at the time of the filing of the complaint for summary ejectment in order to initiate the summary ejectment process." Id. at 587, 19 A.3d at 943.

At the time of the underlying proceedings in this case, Baltimore City required rental properties to be registered as rental properties, but did not require that rental properties be

licensed. On August 1, 2018, a new Baltimore City ordinance became effective, requiring that all Baltimore City rental properties, including one- and multi-family dwellings, be registered, inspected, and licensed to operate as rentals by January 1, 2019. See Baltimore City Code (2020) ("BCC"), Art. 13, §§ 5-1 to 5-26, available at https://ca.baltimorecity. gov/codes/Art%2013%20-%20Housing.pdf [https://perma.cc/WE2N-PUGF]. Under the new rental licensing scheme in Baltimore City, to receive or renew a rental license, a landlord must have a valid use and occupancy permit, where such a permit is required. See BCC, Art. 13, § 5-6(6); Baltimore City Department of Legislative Reference, Building, Fire, and Related Codes of Baltimore City (2018) ("BFRC") §§ 111.5, 116.2(2)(b), 116.5.4(2), available at https://ca.baltimorecity.gov/codes/Art%2000%20%20Bldg,% 20Fire.pdf [https://perma.cc/Y22N-LD84]. Thus, a question arose as to whether the holding in McDaniel applied to Baltimore City use and occupancy permits at the time that Next Generation began the summary ejectment process, i.e., whether prior to January 1, 2019, Next Generation was required to have a valid use and occupancy permit to avail itself of the summary ejectment process. We conclude that the holding in McDaniel did not extend to Baltimore City use and occupancy permits at the time that Next Generation initiated the summary ejectment proceeding in this case.

At the risk of stating the obvious, a use and occupancy permit was not required for a property to be registered as a rental property in Baltimore City. A "use and occupancy permit" is a permit that signifies compliance with the Baltimore City Code and related laws and indicates the Building Official's approval to occupy a structure for the authorized use. See BFRC § 202.2.45. A use and occupancy permit may be issued after inspection where

no violations of the code or other laws exists, and must include, among other things, a statement that the described portion of the structure has been inspected for compliance with the requirements of the code for the occupancy and use for which the proposed occupancy is classified.  See BFRC §§ 1-102, 111.2; International Building Code (2015) § 111.2, available at https://codes.iccsafe.org/content/IBC2015/chapter-1-scope-and-admin istration#IBC2015_Ch01_SubCh02 [https://perma.cc/DD5P-GFLY].  A use and occupancy permit concerns matters broader than the issue of habitability or whether a property is suitable for rent.  And, prior to the new ordinance requiring a use and occupancy permit as part of the rental licensing process, a use and occupancy permit was not expressly linked to a landlord's ability to rent a property.

The Mayor and City Council of Baltimore point out in its amicus brief that a use and occupancy permit is not issued as a matter of routine.  As the Mayor and City Council of Baltimore observe, an occupancy permit is required for newly constructed or renovated rental properties and in certain other circumstances as well.  For example, if a structure is vacated or vacant, it may not be reoccupied until it is satisfactorily rehabilitated and a use and occupancy permit is issued.  See BFRC §§ 116.2, 116.4.3(5).  If a structure is found to be unsafe or unfit for human habitation or other authorized use, it must be rehabilitated, the violation notice or order must be abated, and a use and occupancy permit must be obtained before it may be reoccupied.  See BFRC §§ 116.2, 116.5.4.  Given that use and occupancy permits were not required under the rental property registration process that existed prior to the new rental licensing scheme and are not routinely required for all properties in Baltimore City, though, we decline to apply the holding in McDaniel to

- 15 -

require that Next Generation needed to have a use and occupancy permit before initiating the summary ejectment proceeding in November 2018.

Under the current rental licensing scheme, the situation is different. It is clear that the holding in McDaniel would apply to the need to have a Baltimore City rental license before initiating a summary ejectment proceeding. From our perspective, to avail itself of the summary ejectment process now, a Baltimore City landlord must affirmatively plead and demonstrate in a complaint that the landlord possesses a license to operate the premises. Thus, on remand, Next Generation must satisfy Baltimore City's new licensing requirement and have a valid rental license, before being permitted to move forward with a summary ejectment proceeding. To be clear, we are not herein extending McDaniel to apply to use and occupancy permits. There is no need in this case to extend McDaniel because, following the adoption of the new licensing scheme, McDaniel applies. We simply state that, in accord with McDaniel, on remand, the landlord must affirmatively plead and demonstrate that the landlord possesses a valid rental license in accord with the requirements of BCC, Art. 13, §§ 5-1 to 5-26.

## II.

### The Parties' Contentions

Pettiford contends that the District Court erred in entering a consent judgment where the parties did not enter into a proposed agreement and did not request entry of a consent judgment. Pettiford asserts that the judgment entered in this case was not a consent judgment because it was initiated by the District Court, not the parties, after—not before—trial, without any indication of an agreement, settlement, or consideration, and without

benefit to her or her affirmative consent to entry of judgment. Pettiford maintains that, at trial, she simply testified that she had not paid certain months of rent, and the District Court seized on that to enter a consent judgment. Pettiford contends that, after judgment had been rendered and the matter concluded, her counsel's "thank you" was merely a customary civility, not consent to the judgment. Pettiford argues that, other than acknowledging at trial that she did not pay rent for certain months with an "Mmm-hmm," there was no inquiry into her understanding or acceptance of an agreement or judgment.

Next Generation responds that the circuit court did not err in finding that Pettiford failed to preserve an argument that she did not enter into a consent judgment. Next Generation contends that, ordinarily, no appeal will lie from a consent judgment, and that, here, the record is devoid of an objection to the entering of the judgment in the District Court. Next Generation argues that, to preserve an issue for appeal as to the judgment, Pettiford was required to contest or object to the entry of the judgment, and this Court should not exercise its discretion to review the consent judgment. Next Generation asserts that the judgment entered in this case was a consent judgment because Pettiford acknowledged owing rent, there was an exchange with both parties, and the District Court confirmed that consent had been reached. Next Generation maintains that Pettiford admitted liability and agreed to the consent judgment.

**Law**

Maryland Rule 3-612 governs consent judgments in the District Court and provides: "The court may enter a judgment at any time by consent of the parties." "Consent judgments or decrees are essentially agreements entered into by the parties which must be

endorsed by the court. They have attributes of both contracts and judicial decrees." Chernick v. Chernick, 327 Md. 470, 478, 610 A.2d 770, 774 (1992) (citation omitted). A consent judgment is like any other judgment, with the "distinction [] that it is a judgment that a court enters at the request of the parties." Jones v. Hubbard, 356 Md. 513, 528, 740 A.2d 1004, 1013 (1999). Stated otherwise, "[a] consent judgment or consent order is an agreement of the parties with respect to the resolution of the issues in the case or in settlement of the case, that has been embodied in a court order and entered by the court, thus evidencing its acceptance by the court." Long v. State, 371 Md. 72, 82, 807 A.2d 1, 6 (2002) (cleaned up). A consent judgment "memorializes the parties' agreement to relinquish the right to litigate the controversy," thereby saving the parties "the time, expense, and inevitable risk of litigation." Kent Island, LLC v. DiNapoli, 430 Md. 348, 360, 61 A.3d 21, 28 (2013) (cleaned up).

In Long, 371 Md. at 82-83, 807 A.2d at 7, we explained that a consent judgment embodies the parties' agreement and, therefore, is "in some respects [] contractual in nature[, b]ut it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." (Cleaned up). As to the contractual nature of a consent judgment, we observed that a "consent judgment memorializes the agreement of the parties, pursuant to which they have relinquished the right to litigate the controversy in exchange for a certain outcome and/or, perhaps, expedience." Id. at 83, 807 A.2d at 7. Indeed, a consent judgment is "entered into by parties to a case after careful negotiation has produced agreement on the[] precise terms." Id. at 83, 807 A.2d at 7 (citation omitted). Because a

- 18 -

consent judgment embodies the parties' agreement, it is that "agreement that defines the scope of the decree[,]" meaning that, where an issue as to the scope of the judgment arises, a court looks to the parties' agreement and applies the rules of contract interpretation. Id. at 83-84, 807 A.2d at 7-8. Moreover, for a contract to be binding on the parties, "it must be supported by consideration[,]" which "necessitates that a performance or a return promise must be bargained for." Chernick, 327 Md. at 479, 610 A.2d at 774 (cleaned up). "A performance is bargained for if it is sought by the promisor in exchange for his [or her] promise and is given by the promisee in exchange for that promise." Id. at 480, 610 A.2d at 774 (cleaned up).

"[O]rdinarily, a party may not appeal from a judgment to which [the party] consented[.]" Bryant v. Howard Cty. Dep't of Soc. Servs. ex rel. Costley, 387 Md. 30, 42, 874 A.2d 457, 463 (2005) (citations omitted); see also Chernick, 327 Md. at 477 n.1, 610 A.2d at 773 n.1 ("[G]enerally[,] no appeal will lie from a consent judgment." (Citation omitted)). "This is so because entry of a judgment by consent implies that the terms and conditions have been agreed upon and that the parties have consented to its entry." Long, 371 Md. at 86, 807 A.2d at 9 (cleaned up). Nevertheless,

> [a]n appeal will lie from a court's decision to grant or refuse to vacate a "consent judgment" where it was contended below that the "consent judgment" was not, in fact, a consent judgment because the consent was coerced, the judgment exceeded the scope of consent, or for other reasons there was never any valid consent.

Chernick, 327 Md. at 477 n.1, 610 A.2d at 773 n.1 (citations omitted).

In Dorsey v. Wroten, 35 Md. App. 359, 359-60, 370 A.2d 577, 578 (1977), the Court of Special Appeals held that a trial court abused its discretion in denying a petition to set

aside a purported consent decree. The parties entered into a contract for the sale of land, with the appellant, the seller of the land, agreeing to construct a house. See id. at 360, 370 A.2d at 578. Issues arose concerning the completion and possession of the house, and the appellees filed a complaint for specific performance. See id. at 360, 370 A.2d at 578. The case was set for trial, and, when the case was called that day, the parties' attorneys requested a settlement-type conference in the judge's chambers. See id. at 360, 370 A.2d at 578. The attorneys conferred with their respective clients, and the appellant expressed reservations about the settlement. See id. at 360, 370 A.2d at 578. The appellant and his attorney met with the appellees' attorney before the attorneys met with the trial court to advise that a settlement had been reached. See id. at 360, 370 A.2d at 578-79. The trial court requested that a consent decree be prepared and presented to the court. See id. at 360, 370 A.2d at 579. A few hours later, the appellant told his attorney that he would not agree to a consent decree, and the appellant's attorney met with the trial court to advise as much. See id. at 360-61, 370 A.2d at 579. The trial court stated that the matter was settled and that it would sign the consent decree when it was presented. See id. at 361, 370 A.2d at 579. A few days later, the trial court signed the purported consent decree. See id. at 361, 370 A.2d at 579. The appellant filed a motion to set aside the purported consent decree, which the trial court denied, and the trial court granted a petition to enforce the purported consent decree. See id. at 359-60, 370 A.2d at 578.

The Court of Special Appeals held that the trial court abused its discretion in denying the motion to set aside the purported consent decree because the trial court knew "at the time of the entry of the decree [] that the appellant did not so consent." Id. at 362,

- 20 -

370 A.2d at 579 (footnote omitted). The Court of Special Appeals explained:

> [Al]though the appellant orally agreed to a settlement agreement, it is obvious that he withdrew that consent before the final meeting with the trial [court]. It is also apparent that both the trial [court] and the appellees had full knowledge that the appellant was not consenting to the decree [three] days before it was signed.

Id. at 362, 370 A.2d at 579. The Court of Special Appeals also held that "entry of a judgment by consent implies that the terms and conditions have been agreed upon and consent thereto given in open court or by filed stipulation." Id. at 363, 370 A.2d at 580. In that case, although the trial court determined that both parties had agreed to the terms of the settlement, "it [wa]s obvious there was no consent thereto in open court[,] nor was there a written stipulation filed in court." Id. at 363, 370 A.2d at 580.

In Long, 371 Md. at 77, 807 A.2d at 3-4, this Court held that the Court of Special Appeals erred in entering a modified consent order instead of a consent order submitted by the parties. In the Court of Special Appeals, the parties filed a joint motion to vacate sentence and proposed consent order, embodying their resolution of a civil contempt matter, whereby the petitioner's sentence would have been vacated and his immediate release from incarceration ordered. See id. at 88, 807 A.2d at 10. Rather than entering the proposed order, though, the Court of Special Appeals modified it by vacating the petitioner's sentence and, instead of ordering the petitioner's immediate release, remanding the case for further civil contempt proceedings and a pretrial determination of the petitioner's eligibility for release. See id. at 88-89, 807 A.2d at 10.

In our view, the motion to vacate sentence and proposed order "constituted [a] consent judgment which the[ parties] requested the Court of Special Appeals to enter." Id.

at 88, 807 A.2d at 10. We determined that the Court of Special Appeals erred in entering the modified consent order instead of "the proposed consent order jointly submitted by the parties." Id. at 89, 807 A.2d at 11. We explained:

> The modified order materially altered the agreement reached by the parties: by ordering a remand for further proceedings and a pretrial release determination, it is totally inconsistent with their agreement that the petitioner be released immediately from incarceration. Thus, as the parties correctly point out, by entering the modified consent order[,] the intermediate appellate court improperly substituted its own judgment for that of the parties, and, in the process, undermined the settlement agreement at issue, and consent judgments in general, contrary to the State's longstanding policy of encouraging settlements. . . . That action also deprived both of them of the benefit of their bargain and the petitioner of the alternative right to litigate the dispute.

Id. at 89, 807 A.2d at 11 (footnote omitted).

Similarly, in Smith v. Luber, 165 Md. App. 458, 479, 885 A.2d 894, 906 (2005), the Court of Special Appeals held that a trial court abused its discretion in entering a purported consent order that modified the agreement reached by the parties in open court. At trial, the parties reached agreements as to various issues in the case that would end the litigation, and those agreements were placed on the record in open court. See id. at 465, 885 A.2d at 898. "Both parties were asked qualifying questions by their attorneys about their acceptance of the agreement on the record[,] and both acknowledged their acceptance." Id. at 465, 885 A.2d at 898. The trial court requested that the parties reduce their agreement to writing, and the parties engaged in some back and forth about a draft consent agreement. See id. at 465-66, 885 A.2d at 898-99. After many months, the appellant's attorney advised the trial court that it objected to the proposed consent order submitted by the appellee because it failed to accurately reflect the parties' agreement. See

id. at 466, 885 A.2d at 899. The trial court ultimately executed a purported consent order. See id. at 466, 885 A.2d at 899. The appellant filed a motion to vacate or to alter, amend, or revise the order, which the trial court denied, ruling that the executed order accurately reflected the parties' agreement. See id. at 466, 885 A.2d at 899.

The Court of Special Appeals held that the trial court abused its discretion in entering the order, explaining:

> The parties entered into a valid consent settlement agreement on the record in open court, but refused to consent to the agreement as written. The [trial] court, after months of wrangling between the parties, entered an Order that modified the agreement of the parties as entered on the record. Upon our examination of the Order and the record, we have concluded that several provisions of the [trial] court's Order fail[] to accurately reflect the agreement of the parties entered on the record. Thus, the [trial] court's Order, as entered, modified the parties' agreement and altered the rights of the parties under the agreement.
>     A consent decree implies that the parties have consented to the agreement. In this case, it was clear to both the parties and the [trial] court that there was no consent to the terms of the written agreement. Therefore, we hold it was an abuse of discretion for the trial court to enter the Order . . . , and we remand this case to the trial court to revise the agreement of the parties, tracking the terms and language of the agreement as it appears in the record of the proceedings [that occurred in the trial court].

Id. at 479, 885 A.2d at 906.

**Analysis**

Here, we hold that the judgment entered by the District Court was not a consent judgment, and, as such, Pettiford was not required to object to its entry to preserve for appellate review issues concerning the judgment and merits of the case, but rather could just appeal, as she did. Instead of a consent judgment, the judgment entered in this case was a run-of-the mill judgment determined by a trial court. It is clear that, although the

District Court stated "we'll do a consent judg[]ment" and marked the box next to the word "[c]onsent" on the "DISPOSITION" portion of the form complaint, the judgment was not a consent judgment at all because there had been no agreement between the parties as to resolution of the issues in the case, no agreement had been presented by the parties to the District Court, there was no consideration, and neither Pettiford nor her counsel consented to the so-called consent judgment.

Significantly, the record is devoid of any agreement between the parties with respect to the resolution of the issues in the case. Thus, the judgment entered by the District Court, by definition, was not "an agreement of the parties with respect to the resolution of the issues in the case or in settlement of the case, that has been embodied in a court order and entered by the court, thus evidencing its acceptance by the court." Long, 371 Md. at 82, 807 A.2d at 6 (cleaned up). The record demonstrates that the parties appeared before the District Court prepared to proceed with trial; in other words, there was no agreement reached between the parties pretrial. At the start of the proceeding, Pettiford's counsel moved to dismiss the complaint based on the lack of a use and occupancy permit, and, when the District Court denied the motion, Pettiford's counsel attempted to assert defenses. The parties discussed the amended amount of rent owed, with Pettiford's counsel requesting to see a ledger. At that point, the District Court sent the parties into the hallway to take a look at the ledger. At that time, there was still no agreement between the parties.

The parties returned to the courtroom, and the District Court asked whether they had reached "some type of resolution," and Pettiford's counsel unequivocally responded: "No." The District Court stated it would proceed with trial. Next Generation's agent reiterated

that the parties could not reach an agreement due to the issue that Pettiford raised as to the lack of heat. Pettiford's counsel confirmed, stating that Pettiford was raising a rent escrow defense due to the heat issue. Pettiford addressed the District Court and advised that, although she had hot water, she did not have heat, and she had notified Next Generation about the issue. At that point, clearly there was still no agreement between the parties.

Nonetheless, after Pettiford acknowledged owing rent for four months, the District Court stated: "[T]hen we'll do a consent judg[]ment[.]" It is hard to fathom how any judgment by the District Court at that time could be a consent judgment, where there was no agreement whatsoever entered into between the parties to resolve or settle the case. Indeed, just a short time before the District Court's statement, Next Generation's agent and Pettiford's counsel plainly stated that no resolution of the case had been reached because of the issue as to lack of heat. In other words, there was no agreement or resolution of the issue as to lack of heat. Clearly, Pettiford's position was that the lack of heat excused her from being liable for the rent. Nothing in the record or the transcript leads to the conclusion that the parties reached an agreement, "pursuant to which they have relinquished the right to litigate the controversy in exchange for a certain outcome and/or, perhaps, expedience." Long, 371 Md. at 83, 807 A.2d at 7. In short, there was no agreement between the parties, and, hence, no consent judgment embodying such an agreement.[3]

---

[3]This is not a case where an agreement was reached between the parties and later materially modified by the court, thus depriving the parties "of the benefit of their bargain and [their] alternative right to litigate the dispute[,]" as in Long, 371 Md. at 89, 807 A.2d at 11 (footnote omitted). Rather, there was no agreement between Pettiford and Next Generation in the first instance, and thus nothing that could be, or was, modified by the District Court.

Because there was no agreement of the parties with respect to the resolution of the issues in the case, there obviously was no agreement presented to the District Court. As such, the judgment entered by the District Court was not "a judgment . . . enter[ed] at the request of the parties." Jones, 356 Md. at 528, 740 A.2d at 1013. There was no written agreement between the parties presented to the District Court. Nor was there an oral agreement between the parties on the record. Glaringly, Next Generation's agent and Pettiford's counsel expressly advised the District Court that there was no resolution reached between the parties. The District Court's determination of an amount of rent and late fees due and owing, and imposition of judgment in that amount, did not constitute an agreement of the parties or an agreement that was presented to the District Court.

The record fails to demonstrate that there was any consideration given for settlement of the case, *i.e.*, "a performance or a return promise [that was] bargained for." Chernick, 327 Md. at 479, 610 A.2d at 774 (cleaned up). As we explained in Chernick, id. at 480, 610 A.2d at 774, "[a] performance is bargained for if it is sought by the promisor in exchange for his [or her] promise and is given by the promisee in exchange for that promise." (Cleaned up). Here, it does not appear that any performance or return promise was bargained for, given that no agreement existed between the parties. In other words, there was no consideration exchanged between the parties to support an agreement.

Finally, there was no valid consent by Pettiford to the judgment proposed by the District Court. The record reveals that, once the District Court inquired about the amount of rent and late fees owed, Pettiford stated that she had made a payment and that she owed rent for July, August, September, and October. The District Court asked: "So, she agrees

- 26 -

to [$1,200] times [4,] which is [$4,800,] and then[,] what is your late fee?" Next Generation's agent stated that the late fee was $60. Neither Pettiford nor her counsel stated that she agreed that she owed $4,800, or much less that she would pay that amount. The District Court stated that the total late fee would be $240, for a total amount owed of $5,040 "and we'll cross June off, do you consent to that?" Next Generation's agent replied affirmatively. Notably, neither Pettiford nor her counsel responded to the District Court's question stating that Pettiford consented to that amount. The District Court next asked: "She just said she owes July, August, September[,] and October that she didn't pay it, correct?" Pettiford responded: "Mmm-hmm." Pettiford's response was not a clear or definitive affirmative statement of agreement. Immediately thereafter, the District Court said that they would "do a consent judg[]ment" for $5,040, and Next Generation's agent thanked the District Court. Again, neither Pettiford nor her counsel expressed agreement with the District Court's determination. The District Court thanked the parties for "working it out" and wished them luck, and, at that point, when it seemed as though the proceeding was concluded, Pettiford's counsel thanked the District Court. The District Court realized, however, that $5,040 was more than what Next Generation had sought in the complaint, so it reduced the amount of the judgment to $4,799.64. Next Generation's agent replied "[r]ight[,]" both Pettiford's counsel and Next Generation's agent thanked the District Court, and the proceeding concluded.

From our perspective, a murmured "[m]mm-hmm" from Pettiford and a "thank you" or two from Pettiford's counsel fall far short of constituting valid consent to a consent judgment. We decline to construe a murmur and two expressions of thanks as consent to

- 27 -

the judgment proposed by the District Court. Pettiford's murmured "[m]mm-hmm" could have meant anything, but, in any event, it is clearly not an affirmative or definitive response indicating agreement to the terms of the judgment proposed by the District Court. And, certainly, Pettiford's counsel's expression of thanks was simply an extension of courtesy to the District Court and not consent to the judgment. It is customary for counsel at the end of any proceeding to thank the court for its time and consideration. Pettiford's counsel and Next Generation's agent did the same at the end of the November 19, 2018 proceeding. At bottom, Pettiford simply acknowledged that she had not paid rent for certain months, but at no point did either she or her counsel agree to the amount of rent and late fees owed or to the entry of judgment against her as proposed and ultimately entered by the District Court.

The Court of Special Appeals has stated that "entry of a judgment by consent implies that the terms and conditions have been agreed upon and consent thereto given in open court or by filed stipulation." Dorsey, 35 Md. App. at 363, 370 A.2d at 580. In this case, nothing in the way that the judgment was determined or entered by the District Court leads to the conclusion, or otherwise implies, that the terms and conditions of the judgment were agreed upon by the parties, or that Pettiford consented to them. Because there was no consent judgment, despite the circumstance that the District Court labeled the judgment as such, the general rule that, "ordinarily, a party may not appeal from a judgment to which [the party] consented[,]" Bryant, 387 Md. at 42, 874 A.2d at 463 (citation omitted), does not apply. Pettiford's appeal is properly before this Court.

## III.

## The Parties' Contentions

Pettiford contends that the District Court erred in precluding her from asserting defenses under the implied warranty of habitability and under Maryland and Baltimore City rent escrow statutes. Pettiford argues that she was entitled to assert an affirmative defense of breach of the implied warranty of habitability, and that the District Court improperly "threaten[ed] her with imminent eviction[.]" Pettiford asserts that the District Court's refusal to hear any information related to the defense, such as the conditions of disrepair forming the basis of the defense, denied her the statutory right to seek a setoff from the rent and late fees claimed by Next Generation. Pettiford maintains that the District Court erred in refusing to consider her rent escrow arguments, and ruling that she would not have needed heat for the months at issue. Pettiford contends that the rent escrow statutes entitle her to raise a defense to remedy defects that constitute, or will constitute, a fire hazard or substantial threat to life, health, or safety, and argues that lack of heat from February to November qualified as such a defect.

Next Generation responds that the District Court properly rejected the claims for rent escrow pursuant to the warranty of habitability based on the lack of heat because Pettiford failed to establish the defect and because the defense did not apply for the months at issue. Next Generation contends that the District Court did not refuse to hear the defense raised pursuant to the implied warranty of habitability, and instead sought to protect Pettiford from the danger that she alleged was imminent. Next Generation argues that the District Court heard arguments from the parties on the rent escrow issue and determined

that the issue being raised did not constitute a serious threat to life, health, or safety, especially during the months for which rent was claimed.

## Summary Ejectment

RP § 8-401(a) provides that, "[w]henever the tenant [] fail[s] to pay the rent when due and payable, it shall be lawful for the landlord to have again and repossess the premises." An action under RP § 8-401 is known as a summary ejectment action, and such "proceedings empower the court to enter a money judgment for the amount of rent determined to be owing[,] and also to issue an order for the tenant to yield possession of the premises when the jurisdiction over the tenant has been obtained." Cane v. EZ Rentals, 450 Md. 597, 602, 149 A.3d 649, 652 (2016) (cleaned up). An "aggrieved landlord need only file a verified complaint for repossession in the District Court, alleging title to the premises, the name of each tenant, and the amount of rent due and owing" to initiate summary ejectment proceedings. McDaniel, 419 Md. at 575, 19 A.3d at 936. In Cane, 450 Md. at 602-03, 149 A.3d at 652, we explained summary ejectment proceedings under RP § 8-401:

> Summary ejectment proceedings are expedited. A trial is ordinarily to be held on the fifth day following the filing of the complaint. RP § 8-401(b)(3)(i). The statute allows a court to adjourn the trial for one day to permit a party to procure necessary witnesses if it is in "the interests of justice," but requires the consent of both the landlord and the tenant for a longer postponement. RP § 8-401(c)(1). If the tenant was personally served with the complaint[,] and if the trial does not take place within five days of the filing of the complaint, the trial court may include in the judgment any unpaid rent and late fees accruing since the filing of the complaint, as well as court costs. RP § 8-401(c)(2)(iii)-(iv). If judgment is for the landlord, the tenant ordinarily must vacate the premises within four days. RP § 8-401(c)(3).
>
> If the judgment is in favor of the landlord, including restitution of the

premises, the tenant has a "right to redemption of the leased premises" if the tenant tenders to the landlord the amount of the judgment, as well as any court-awarded costs and fees, before the execution of the judgment. RP § 8-401(e)(1). However, a tenant who has had three judgments of possession for unpaid rent within the previous 12 months does not have a right of redemption. RP § 8-401(e)(2). When a court holds that a tenant no longer may redeem the tenancy for that reason, it is said to foreclose the right of redemption.

Summary ejectment cases originate in the District Court. RP § 8-401(b). Either party may appeal to the [c]ircuit [c]ourt within four days of the District Court's judgment. RP § 8-401(f)(1). If the tenant appeals, the tenant must furnish an appeal bond to stay execution of the judgment. RP § 8-401(f)(2)-(3).

In McDaniel, 419 Md. at 578, 19 A.3d at 937, we remarked that "[it] is obvious that, in this truncated process, the landlord's entitlement to enforcement of his [or her] superior interest in the premises is a given, once the failure to pay rent is proven and appropriate notice is provided."

## Rent Escrow

RP § 8-211, the rent escrow statute, "is designed to provide an incentive for a landlord to repair 'serious and dangerous defects' in a residential rental unit by creating 'meaningful sanctions' for a landlord who allows such conditions to exist." Cane, 450 Md. at 603, 149 A.3d at 652 (quoting RP § 8-211(a)-(b)). The rent escrow statute is remedial legislation that should not be narrowly construed. See Cane, 450 Md. at 603, 149 A.3d at 652 (citation omitted). In Neal v. Fisher, 312 Md. 685, 693-94, 541 A.2d 1314, 1318-19 (1988), this Court discussed the remedial nature of the rent escrow statute, stating:

[The rent escrow statute is] remedial legislation. When the [General Assembly] enacts a statute designed, as the [rent escrow statute] is, to provide remedies not available at common law, it is not desirable that construction should be mindlessly guided by a slogan, such as statutes in derogation of the common law must be narrowly construed. Statutes of this nature are

- 31 -

remedial and designed to close a gap in the preexisting law[.] A court should not permit a narrow or grudging process of construction to exemplify and perpetuate the very evils to be remedied[.] . . . We look at the words of the statute in the context of their adoption[,] and[,] from that perspective[,] determine the meaning of the language in a manner consistent with the goal [that] the [General Assembly] was trying to achieve.

(Cleaned up).

RP § 8-211(e) states that it "provides a remedy and imposes an obligation upon landlords to repair and eliminate conditions and defects which constitute, or[,] if not promptly corrected[,] will constitute, a fire hazard or a serious and substantial threat to the life, health[,] or safety of occupants[.]" RP § 8-211(e) "provides a non-exhaustive list of examples of conditions for which a tenant may seek relief under [the] statute." Cane, 450 Md. at 604, 149 A.3d at 652. Those conditions include, among other things, a lack of heat or hot or cold running water, "except where the tenant is responsible for the payment of the utilities and the lack thereof is the direct result of the tenant's failure to pay the charges[,]" RP § 8-211(e)(1), or "[t]he existence of any structural defect which presents a serious and substantial threat to the physical safety of the occupants[,]" RP § 8-211(e)(4). "There is a rebuttable presumption that [certain] conditions, when they do not present a serious and substantial threat to the life, health[,] and safety of the occupants, are not covered by" the section, such as "[s]mall cracks in the walls, floors[,] or ceilings" or "[t]he absence of air conditioning." RP § 8-211(f)(2), (4).

In Cane, 450 Md. at 604-05, 149 A.3d at 653, as to the process under the rent escrow statute, we summarized:

The rent escrow statute creates both an affirmative cause of action for a tenant and a defense to certain actions brought by a landlord. If the tenant

notifies the landlord of serious conditions or defects, and "if the landlord refuses to make the repairs or correct the conditions, or if[,] after a reasonable time[,] the landlord has failed to do so, the tenant may bring an action of rent escrow to pay rent into court because of the asserted defects or conditions." RP § 8-211(i). The tenant also "may refuse to pay rent and raise the existence of the asserted defects or conditions as an affirmative defense" to an action brought by the landlord to obtain the rent or recover possession of the premises. *Id.* As a condition for relief under the statute, the tenant must notify the landlord of the defect[,] and may be required to pay the rent to the court. RP § 8-211(g) and (k). Tenants who have a certain number of judgments for unpaid rent within the [twelve] months prior to initiation of the action may not obtain relief under the statute. *Id.*

In adjudicating issues under the rent escrow statute, the trial court is to make "appropriate findings of fact" and order relief either for the landlord—*e.g.*, termination of the lease and restitution of the premises—or the tenant—*e.g.*, abatement of the rent and an order that the landlord make necessary repairs. RP § 8-211(m).

(Brackets omitted).

In Cane, 450 Md. at 601-02, 149 A.3d at 651, this Court held that a tenant was not required to present her rent escrow claims in a separate action, but instead could present the claims in defense of a summary ejectment action brought by a landlord, and we remanded the case to the trial court for consideration as to whether the tenant's proffered evidence was a valid defense to the summary ejectment action. The landlord filed a summary ejectment action against the tenant for one month of unpaid rent and to regain possession of the apartment. See id. at 601, 149 A.3d at 651. During a bench trial, the tenant "attempted to submit evidence of what she asserted were serious defects in the rental property, including a leak that resulted in a threat to shut off water service to the property." Id. at 601, 149 A.3d at 651. The trial court declined to accept the proffered evidence, ruling that such evidence would be relevant only in a rent escrow action, which the trial court believed needed to be filed as a separate action. See id. at 601, 149 A.3d at 651. The trial

court ultimately entered a money judgment in the landlord's favor and awarded possession of the property to the landlord. See id. at 601, 149 A.3d at 651.

We held that a tenant may raise issues under the rent escrow statute as an affirmative defense in a summary ejectment action. See id. at 613, 149 A.3d at 658. We observed that RP § 8-211(i) provides that "a tenant 'may refuse to pay rent and raise the existence of the asserted defects or conditions as an affirmative defense . . . to any complaint proceeding brought by the landlord to recover rent or the possession of the leased premises.'" Cane, 450 Md. at 613, 149 A.3d at 658 (quoting RP § 8-211(i)) (cleaned up). And, because RP § 8-401, the summary ejectment statute, authorizes a court to enter a money judgment for the amount of unpaid rent and to issue an order for the tenant to relinquish possession of the premises to the landlord, we concluded that a summary ejectment action constitutes a proceeding brought by a landlord to recover rent or the possession of the leased premises under RP § 8-211(i). See Cane, 450 Md. at 613, 149 A.3d at 658. We explained that, if a tenant successfully "establish[es] a defense under the rent escrow statute, the tenant is entitled to various forms of relief [under] the statute 'whether the issue of rent escrow is raised affirmatively or defensively.'" Id. at 614, 149 A.3d at 658 (quoting RP § 8-211(j)) (cleaned up). One such type of relief is that the trial court may allow a setoff of the rent owed by the tenant to the extent equitable in light of the conditions or defects the trial court finds. See Cane, 450 Md. at 614, 149 A.3d at 658.

We rejected the landlord's contention that the trial court considered the tenant's rent escrow defense, but determined that the conditions or defects alleged were not serious enough to support a rent escrow claim. See id. at 614, 149 A.3d at 658. In our view, the

trial court "consistently declined to accept evidence or hear argument from [the tenant] concerning what she contended were serious defects in the property that the landlord had failed to correct." Id. at 614, 149 A.3d at 658. Rather, the record revealed that, at one point, the trial court had cut the tenant off, stating that it would not hear anything other than arguments related to the alleged failure to pay rent. See id. at 614, 149 A.3d at 658. And, we concluded that the trial court made no factual findings with respect to the tenant's assertions, which the trial court would have made had it addressed the merits. See id. at 615, 149 A.3d at 659. We vacated the trial court's judgment and "remand[ed] the case for reconsideration in light of [the tenant]'s proffered rent escrow defense." Id. at 617, 149 A.3d at 660 (citation omitted). We stated that, on remand, the tenant could submit evidence of the alleged defects and conditions that existed in the property, and that the trial court would determine whether those defects and conditions "were sufficient to trigger the remedies available under the rent escrow statute." Id. at 617, 149 A.3d at 660.

## Baltimore City Public Local Laws

RP § 8-208, concerning written lease requirements for residential dwelling units, provides:

> No provision of this section shall be deemed to be a bar to the applicability of supplementary rights afforded by any public local law enacted by the General Assembly or any ordinance or local law enacted by any municipality or political subdivision of this State; provided, however, that no such law can diminish or limit any right or remedy granted under the provisions of this section.

RP § 8-208(f). To that end, the Code of Public Local Laws of Baltimore City (2016) ("PLL") § 9-9, Baltimore City's rent escrow law, mirrors RP § 8-211 and provides that

there are "structures used for human habitation which are, or may become in the future, substandard with respect to structure, equipment[,] or maintenance[,] and [] such conditions constitute a menace to the health, safety, welfare[,] and reasonable comfort of [] citizens." PLL § 9-9(a)(1). "[P]ublic policy require[s] that meaningful sanctions be imposed upon those who would perpetrate or perpetuate [] such conditions[.]" PLL § 9-9(a)(4). Such "sanctions are intended to protect the life, health[,] and safety of tenants and are not to be used to have premises redecorated or to have minor code violations corrected." Id.

PLL § 9-9(b) authorizes a Baltimore City tenant to assert conditions that constitute, or will constitute if not promptly corrected, "a fire hazard or serious threat to the life, health, or safety of occupants[], including[,] but not limited to, a lack of heat[.]" A Baltimore City tenant may make such an assertion either on his or her own initiative through a filing in the District Court, see PLL § 9-9(c)(1), or by raising "as a defense in answer to an action of distress for rent or in any complaint proceeding brought by a landlord to recover rent or the possession of leased premises for nonpayment of rent[,]" PLL § 9-9(c)(2). To make such an assertion, there must be prior notice to the landlord of the condition by, for example, notice in writing by certified mail from the tenant or "actual notice of the defects or conditions, but that the landlord has refused, or having a reasonable opportunity to do so, has failed to remedy the same." PLL § 9-9(d)(1). Also, to make the assertion, there must be "[p]ayment by the tenant into court of the amount of rent called for under the lease at the time of any assertion of rent escrow, unless or until such amount is modified by subsequent order of the court[.]" PLL § 9-9(d)(2). The District Court is required to make

factual findings on such issues and "make any order that the justice of the case may require." PLL § 9-9(f).

PLL § 9-14.1, concerning the implied warranty of fitness, also known as the implied warranty of habitability, provides that, "[i]n any written or oral lease or agreement for rental of a dwelling intended for human habitation, the landlord shall be deemed to covenant and warrant that the dwelling is fit for human habitation." PLL § 9-14.1(a). PLL § 9-14.1(b)(3) defines "fit for human habitation" as meaning that "the premises shall not have any conditions which endanger the life, health[,] and safety of the tenants, including, but not limited to[,] . . . lack of heat[.]"

PLL § 9-14.2, entitled "Implied warranty of fitness – continuation during tenancy," similarly defines "fit for human habitation" as meaning that "the premises shall not have any conditions which endanger the life, health[,] and safety of the tenants involving . . . lack of heat[.]" PLL § 9-14.2(a)(4). PLL § 9-14.2(b) provides:

> The warranty of habitability provided in [PLL §] 9-14.1 is a continuing warranty, and the tenant may maintain an action for breach of this warranty, at any time during the tenancy, if the dwelling becomes unfit for human habitation. An action for breach of this warranty may also be maintained as a defense in an action of summary ejectment or distress for rent.

Nonetheless, "[n]o action for breach of warranty may be maintained unless the landlord has notice or knowledge of the conditions which constitute the alleged breach of the warranty of habitability." PLL § 9-14.2(c). "'Notice' means a violation notice from the Department of Housing and Community Development or any other municipal or governmental agency, or a letter sent by the tenant or his [or her] agent to the landlord by certified mail, or actual notice of the defects or conditions." PLL § 9-14.2(a)(3). After

- 37 -

notice, "[t]he landlord has a reasonable time . . . to repair the defect or damage alleged by the tenant except that there should be a rebuttable presumption that a period in excess of [thirty] days by the landlord would be unreasonable." PLL § 9-14.2(c). Significantly, PLL § 9-14.2(d) provides that a "tenant may maintain a defense based on [PLL § 9-14.2] to the landlord's action in summary ejectment" and that damages are to "be computed retroactively to the date of the landlord's actual knowledge of the breach of warranty[,] and shall be the amount of rent paid or owed by the tenant during the time of the breach[,] less the reasonable rental value of the dwelling in its deteriorated condition."

In Benik v. Hatcher, 358 Md. 507, 530-31, 750 A.2d 10, 23 (2000), a lead-based paint case, this Court discussed the significance of PLL § 9-14.1 and the implied warranty of habitability, observing:

> The implied warranty provisions establish a threshold for the lease of premises[,] and that threshold is based on the purpose of the Baltimore City Housing Code[] to make dwellings safe, sanitary[,] and fit for human habitation, for the benefit of the health and safety of the people. These provisions, like the Code of which it is a part, are applications of the police power of [] Baltimore[ City]. They are examples of public health and safety regulations. [Baltimore] City has a vital interest and public purpose in ensuring the habitability of its housing stock[,] and in the health and safety of its people.

(Cleaned up).

## Analysis

In this case, we hold that the District Court improperly precluded Pettiford from asserting and litigating defenses under the implied warranty of habitability and the rent escrow statutes, and that Pettiford was statutorily entitled to raise such defenses during the summary ejectment proceeding and to have them fully considered. The implied warranty

- 38 -

of habitability, PLL § 9-14.1(a) provides that, in any rental lease, "the landlord shall be deemed to covenant and warrant that the dwelling is fit for human habitation." That implied warranty of habitability continues during the tenancy and requires that premises remain fit for human habitation, see PLL § 9-14.2(b), meaning that "the premises shall not have any conditions which endanger the life, health[,] and safety of the tenants involving . . . lack of heat," PLL § 9-14.2(a)(4). Pursuant to PLL § 9-14.2(b), a "tenant may maintain an action for breach of th[e] warranty, at any time during the tenancy, if the dwelling becomes unfit for human habitation[,]" and "[a]n action for breach [] may also be maintained as a defense in an action of summary ejectment[.]" And, PLL § 9-14.2(d) states that a "tenant may maintain a defense based on [PLL § 9-14.2] to the landlord's action in summary ejectment[.]" Of course, to raise an issue as to breach of the warranty of habitability, the landlord must have notice of the alleged breach, in one of the manners prescribed, and the landlord must be given reasonable time to repair the defect. See PLL § 9-14.2(c).

Just a few years ago, in Cane, 450 Md. at 601-02, 613, 149 A.3d at 651, 658, this Court held that a tenant may raise issues under RP § 8-211, the rent escrow statute, as an affirmative defense in a summary ejectment proceeding, and is not required to raise such issues in a separate action. RP § 8-211(i) provides that a tenant "may refuse to pay rent and raise the existence of the asserted defects or conditions as an affirmative defense . . . to any complaint proceeding brought by the landlord to recover rent or the possession of the leased premises." And, because RP § 8-401, the summary ejectment statute, authorizes a court to enter a money judgment for the amount of unpaid rent and to issue an order for

the tenant to relinquish possession of the premises to the landlord, in <u>Cane</u>, 450 Md. at 613, 149 A.3d at 658, we concluded that a summary ejectment action constitutes a proceeding brought by a landlord to recover rent or the possession of the leased premises under RP § 8-211(i). Plainly, a rent escrow issue may be raised as a defense in a summary ejectment proceeding.

PLL § 9-9, Baltimore City's rent escrow law, mirrors RP § 8-211 and expressly provides that an assertion of a condition that constitutes, or if not promptly corrected will constitute, a fire hazard or serious threat to the life, health, or safety of occupants, <u>see</u> PLL § 9-9(b), may be made by the filing of the tenant, *i.e.*, institution of a rent escrow action, <u>see</u> PLL § 9-9(c)(1), or "by the tenant as a defense in answer to an action of distress for rent or in any complaint proceeding brought by a landlord to recover rent or the possession of leased premises for nonpayment of rent[,]" PLL § 9-9(b)(2). In other words, a claim for rent escrow under both RP § 8-211 and PLL § 9-9 may be raised as a defense in a summary ejectment proceeding, and need not be raised in a separate rent escrow action.

Put simply, a claim for breach of the warranty of habitability or under the rent escrow statutes may be raised as a defense in a summary ejectment proceeding. This is exactly what Pettiford attempted to do in this case. Once they were raised, the District Court was required to consider the defenses. Instead, the District Court cut off Pettiford's defenses at the knees, effectively denying her the right to seek relief and defend against the summary ejectment proceeding. Indeed, when Pettiford's counsel attempted to raise breach of the warranty of habitability as a defense, rather than accepting evidence or hearing argument from Pettiford's counsel on the issue, the District Court stated: "[I]f you

don't think [that] it's habitable[,] I'm not going [to] let her stay in the property." Pettiford's counsel attempted to assert a claim for rent escrow, and the District Court stated: "Well[,] if it's uninhabitable[,] I'm not going to let her stay in it. . . . [Bec]ause[,] if something happens to her[,] and you've told me [that] it's uninhabitable[,] it's on me. So, she'll be out by midnight tonight if she wants to claim [that] it's uninhabitable." Faced with the District Court's implacability, Pettiford's counsel responded that, in "that case[,] we cannot[,]" and did not pursue the breach of the warranty of habitability issue further. Essentially, the District Court's statements served as a threat of immediate eviction if Pettiford were to pursue the defense of breach of the warranty of habitability. She was faced with the choice of asserting the defense and possibly prevailing on the merits and staving off the summary ejectment proceeding, yet nonetheless being ordered by the District Court to leave the premises by midnight, or abandoning the defense to ensure that she could remain in her home at least another night and have the opportunity to redeem the property if Next Generation were awarded judgment. The options offered by the District Court unmistakably deprived Pettiford of her statutory right to pursue breach of the warranty of habitability related to the lack of heat for approximately nine months. It is no wonder that her counsel stated that, under those circumstances, she could not proceed with the defense. Additionally, the District Court made no factual findings with respect to Pettiford's assertion about the breach of the warranty of habitability, because it had not bothered to address the merits of the defense raised. Cf. Cane, 450 Md. at 614-15, 149 A.3d at 658-59 (This Court concluded that the trial court had not addressed the merits of a tenant's rent escrow issue because the trial court made no factual findings with respect to

the tenant's assertions and otherwise cut the tenant off, stating that it would not hear arguments other than those related to the alleged failure to pay rent.).

The District Court's handling of the rent escrow defense was little better. After the failed settlement talk in the hallway, the parties returned to the courtroom, and Next Generation's agent advised that the parties could not reach an agreement due to the issue of the lack of heat raised by Pettiford. The District Court asked: "Well[,] this isn't an escrow case, right?" Pettiford's counsel responded that Pettiford was raising a rent escrow defense based on the lack of heat in the property since February 2018, approximately nine months earlier. The District Court asked whether Pettiford provided notice of the issue to Next Generation, and Pettiford stated that she had been in contact with an individual at Next Generation to advise that the furnace was not working. According to Pettiford, a maintenance person was supposed to come to the property on multiple occasions to light the furnace, but that did not happen, and she still did not have heat as of that day. The District Court asked: "[S]o this is only for June, July, August, September[,] and October? . . . When you wouldn't have needed heat. . . . So, you can open your escrow for November[, b]ut they're not asking for November." The District Court reiterated that Pettiford could "go to the [C]lerk's [O]ffice and open that for November."

These exchanges and the District Court's remarks tend to show that the District Court did not understand that a rent escrow issue could be raised as a defense in the summary ejectment proceeding, and that the issue did not need to be raised in a separate action. For example, after being advised that the parties had not reached a resolution due to the issue as to lack of heat, the District Court's response was to inquire about the nature

- 42 -

of the case and confirm that the case was not "an escrow case[.]" And, a short while thereafter, the District Court told Pettiford that she could "open" an escrow claim for November of 2018, and that she could go to the Clerk's Office to do so. The District Court's remarks and advice lead to the conclusion that the District Court believed that a rent escrow issue had to be opened as a new case through the Clerk's Office, and could not be considered as a defense in the summary ejectment proceeding.

Moreover, the District Court improperly concluded that, because the complaint sought rent only for June through October, and because Pettiford would not "have needed heat" for those months, a rent escrow issue could not be raised in the summary ejectment action. It is certainly not clear that Pettiford would not have needed heat for the months for which Next Generation sought rent, and the District Court did not entertain arguments from the parties or hear any testimony about that matter. Nothing in the rent escrow statutes sets forth a temporal limitation, providing that a rent escrow claim may only be made for certain times of the year or under certain conditions. RP § 8-211(i) provides that, if a landlord refuses to make repairs or correct the hazardous condition, "the tenant may refuse to pay rent and raise the existence of the asserted defects or conditions as an affirmative defense . . . to any complaint proceeding brought by the landlord to recover rent or the possession of the leased premises." PLL § 9-9(c)(2) provides similarly.

RP § 8-211(i) and PLL § 9-9(c)(2) do not state that a rent escrow defense may be raised only where the hazardous condition complained of occurred or impacted the tenant during the months for which rent is sought to be recovered by the landlord. In Cane, 450 Md. at 603, 149 A.3d at 652, we stated in no uncertain terms that RP § 8-211 is remedial

legislation that should not be narrowly construed, and is meant to provide an incentive for a landlord to repair serious and dangerous conditions in a residential rental unit through significant sanctions for a landlord who allows such conditions to exist. The same may be said of PLL § 9-9. We conclude that the District Court erred both in implying that Pettiford's rent escrow defense could be raised only in a separate rent escrow action, and in dismissing the defense out of hand with the remark that, because Pettiford supposedly would not have needed heat during the months for which Next Generation sought to recover rent, it would not consider the defense.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE DISTRICT COURT OF MARYLAND, SITTING IN BALTIMORE CITY, AND TO REMAND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. RESPONDENT TO PAY COSTS.**

Circuit Court for Baltimore City
Case No. 24-C-19-000329
Argued: December 9, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 34

September Term, 2019

_____

LATASHIA PETTIFORD

v.

NEXT GENERATION TRUST SERVICE

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Raker, Irma S. (Senior
Judge, Specially Assigned)

JJ.

_____

Concurring Opinion by McDonald, J.,
which Barbera, C.J., joins.

_____

Filed: March 26, 2020

I agree with the Majority Opinion's disposition of this case and generally with its analysis of most of the issues. I disagree with certain dicta in the Majority Opinion – in particular, its conclusion that the holding in *McDaniel v. Baranowski*, 419 Md. 560 (2011), does not apply to an occupancy permit that a landlord is required to have under the Baltimore City Code.

In *McDaniel*, the Court held that a landlord in Anne Arundel County did not have the right to invoke the "truncated process" of summary ejectment if the landlord lacked the appropriate authorization from the local jurisdiction to operate the rental unit – in that case, a license issued by the county Department of Inspections and Permits. 419 Md. at 563, 578. The Court recognized that the label "license" was not determinative of the issue, as it noted that some licenses are simply revenue-raising measures. *Id*. at 583. The key question was whether the purpose of the statute imposing the requirement was "to eliminate a perceived harm." *Id*. The license requirement in *McDaniel* was "designed to insure the safety and habitability of the premises, namely that the dwelling is clean, sanitary, fit for human occupancy and in compliance with … other applicable State and County law." *Id*. at 564-65. Notably, it was not required of all landlords in the County; rather, it applied only to the rental of multi-family units.

Prior to the recent adoption of a landlord licensing regime in Baltimore City, some landlords, such as Next Generation, were required to have occupancy permits, particularly when, as in this case, the building containing the rental unit had previously been declared "unsafe or unfit for human habitation." Baltimore City Building, Fire and Related Codes, §§116.1, 116.5. The occupancy permit "indicates … approval to occupy a structure for the

authorized use." *Id.*, §202.2.45. In this case, that use was as a rental unit. In the amicus brief it filed in this case, Baltimore City states that its "occupancy permits are required for the protection of the public and fall within the scope of *McDaniel*'s holding." I agree.

Chief Judge Barbera has advised that she joins this opinion.