*Qun Lin v. Jose Reyes Cruz, et al.*
No. 2944, Sept. Term, 2018
Opinion by Leahy, J.

**Testimony>Credibility Determination>Bench Trial**

When weighing the credibility of witnesses and resolving conflicts in the evidence, "the fact-finder has the discretion to decide which evidence to credit and which to reject." *Hollingsworth & Vose Co. v. Connor*, 136 Md. App. 91, 136, (2000). "In this regard, it may believe part of a particular witness's testimony but disbelieve other parts." *Id.* Mr. Chen's deposition testimony was admitted, in its entirety, as a joint exhibit. Appellant had the opportunity to object to the admission of the entire deposition at trial, and to cross-examine Mr. Chen at his deposition. We hold that the trial judge, in performing his role as factfinder, did not err when he credited certain parts of Mr. Chen's deposition testimony and disbelieved others.

**Labor and Employment>Economic Reality Test**

To determine whether an individual qualifies as an employer under the Fair Labor Standards Act of 1938 (FLSA), the Maryland Wage and Hour Law (MWHL), and the Maryland Wage Payment and Collection Law (MWPCL), both Maryland and Federal courts apply the economic reality test.

**Labor and Employment>Economic Reality Test**

This Court has considered claims against individuals for violations of Maryland's wage and hour laws, even though the individuals had sought to limit their exposure by forming limited liability companies. *Pinnacle Grp., LLC v. Kelly*, 235 Md. App. 436, 445 (2018), *cert. denied sub nom. Pinnacle Grp. v. Kelly*, 459 Md. 188 (2018); *see also Campusano v. Lusitano Cont. LLC,* 208 Md. App. 29, 32-33 (2012).

**Labor and Employment>Sole Proprietorship**

Because the sole proprietor and the business share an identity, some courts have acknowledged that a sole proprietor will be liable for the business's violations of the FLSA. *See Teri v. Spinelli*, 980 F. Supp. 2d 366, 372 n.10 (2013) ("[A]s a sole proprietor, [the defendant] is personally liable for debts arising out of his business conduct.").

**Labor and Employment>Corporations >Economic Reality Test**

Teppanyaki Grill was organized as a corporation through articles of incorporation filed with SDAT. Therefore, it is necessary to apply the economic reality test in order to determine whether Appellant may be held individually liable as an employer; unless, perhaps, the corporate veil can be pierced to hold an individual accountable as owner of the company.

Circuit Court for Montgomery County
Case No. 430511V

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2944

September Term, 2018

_____

QUN LIN

v.

JOSE REYES CRUZ, ET AL.

_____

Fader, C.J.,
Leahy,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  September 30, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In this appeal concerning a complaint for unpaid wages, we discuss the framework for application of the "economic reality test" first articulated by the Supreme Court in *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 726-27 (1947). Although it sounds like something in the nature of an investment strategy, the "economic reality test" springs from cases construing the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219 ("FLSA"), to assess individual liability as an employer for undercompensated employees.

Jose Angel Reyes Cruz, Jose Jorge Perez Gonzalez, and Jesus Emanuel Sanchez Vasquez (collectively, "Employees") were formerly employed by the Teppanyaki Grill & Supreme Buffet ("Teppanyaki Grill") in Rockville, Maryland. They filed a complaint in the Circuit Court for Montgomery County, asserting claims for unpaid wages under the FLSA, the Maryland Wage and Hour Law, Maryland Code, Labor & Employment Article ("LE") (1999, 2016 Repl. Vol., 2018 Supp.), §§ 3-401-431 ("MWHL"), the Maryland Wage Payment and Collection Law, Maryland Code, Labor & Employment Article ("LE") (1999, 2016 Repl. Vol., 2018 Supp.), §§ 3-501-509 ("MWPCL"), and the Montgomery County Minimum Wage Act ("MCMWA"). The Employees initially sued Weiguang Chen and Teppanyaki Grill, later adding Qun Lin (the "Appellant"), and his son, Li Lin.

Teppanyaki Grill failed to answer the complaint and was not represented at trial before a circuit court judge. No business records were introduced showing any of the Employees' work hours or rates of pay because, as witnesses confirmed in their deposition and trial testimony, no such records were kept. Similarly, there was very little documentary evidence introduced to show who should be held liable as the employer under the relevant statutes. Aside from testimony, the following documents were introduced: (1) the Articles

of Incorporation for Teppanyaki Grill, bearing the name and signature, "Weiguang Chen"; (2) a lease for the property where the restaurant was located, signed by Appellant; and (3) two amendments of the lease, all bearing the name and signature of Appellant. Appellant asserted at trial that he only signed the lease as a favor to Mr. Chen and that he did not have any interest in the business.

The court found that Appellant was the owner of the business and held him personally liable for the Employees' unpaid wages. The judge based his ruling on the amount of financial risk incurred under the lease, as well as the language "Qun Lin, dba Teppanyaki Grill and Supreme Buffet" on the second amendment to the lease. The judge also concluded that he did not have sufficient evidence to hold Mr. Chen liable for the Employees' unpaid wages.

On appeal, Appellant does not dispute the Employees' entitlement to unpaid wages or the amount owed. He claims, however, that he is not liable for the unpaid wages because he does not own Teppanyaki Grill or have any stake in the business. Appellant presents four questions[1] for our review, which we reorder and reframe as three:

---

[1] The issues as presented in Appellant's brief are:

I.  "Did the trial court abuse its discretion in finding Appellant was an owner and operator of Co-Defendant Teppanyaki Grill & Supreme Buffet, Inc.?"
II.  "Did the trial court abuse its discretion in finding Appellant was an employer pursuant to the Economic Realities Test?"
III.  "Did the trial court abuse its discretion when it relied upon selected statements made in Wei-Guang Chen's deposition and then found other parts incredulous?"
IV.  "Did the trial court err in awarding attorney's fees?"

2

I.       Was it clearly erroneous for the trial judge to credit selected statements from Mr. Chen's deposition testimony after finding other parts incredible?

II.      Did the trial court err in finding Appellant was an owner and operator of Co-Defendant Teppanyaki Grill & Supreme Buffet, Inc.?

III.     Did the trial court err in awarding attorney's fees?

We conclude that the trial court rightly credited certain parts of Mr. Chen's deposition testimony while doubting other parts because it is the role of a judge in a case tried to the court to make such credibility determinations, and we will not disturb such determinations unless clearly erroneous.   In determining whether Appellant was the owner of Teppanyaki Grill, however, the trial judge failed to apply the economic reality test or articulate an alternate legal principle for his assignment of liability for the Employees' wages.  We do not reach the issue of attorney's fees in light of this holding.  Accordingly, we remand the case for further proceedings so that the court can apply the appropriate theories of liability discussed in this opinion.

## BACKGROUND

The complaint for unpaid wages, filed in the Circuit Court for Montgomery County on February 27, 2017, alleged that the Employees worked at Teppanyaki Grill and that Weiguang Chen[2] owned and/or operated Teppanyaki Grill at all relevant times during their employment.  It also alleged that Mr. Chen had the authority to "hire, fire, suspend, and

---

[2] Initially, the Employees sued both Weiguang Chen and "Ray Chen."  Their second amended complaint reflected that Weiguang Chen and Ray Chen are, in fact, the same person.

3

otherwise discipline" the Employees. The complaint set forth the time periods that the Employees worked at Teppanyaki and alleged that, during the time that they worked there, Mr. Chen failed to pay them minimum wage or overtime pay in violation of federal (FLSA), state (MWHL, MWPCL), and county (MCMWA) law.

Six weeks later, an amended complaint added three other employees as plaintiffs.[3] Finally, on June 16, 2017, a second amended complaint added, as defendants, "Yun Lin" (aka Qun Lin, Appellant) and "Li Lin."[4] It alleged that Appellant and Li Lin were *also* employers during the time that all of the employees worked at Teppanyaki Grill.

After Mr. Chen filed his answer, the parties who had entered appearances filed a "Joint Motion to Toll and Extend Deadlines" on August 10, 2017. The motion noted that Mr. Chen was asserting that Appellant and Li Lin—father and son—were the rightful owners of Teppanyaki Grill and the rightful defendants in the case. The circuit court granted the motion and tolled the discovery period for "60 days or until Messrs. Lin have filed their answer, whichever is sooner[.]"

Appellant and Li Lin filed their answers on September 18, 2017, as well as oppositions to the order of default that had been entered against them four days earlier. In his opposition, Appellant asserted that he was not the owner of Teppanyaki Grill and, thus, the suit against him failed to state a claim. In support of this contention, he submitted

---

[3] These employees ultimately did not appear at trial or participate in the appeal to this Court.

[4] In their complaint, the Employees misspelled Qun Lin's name.

records from the State Department of Assessments and Taxation ("SDAT") that named Mr. Chen as the business owner. He also noted that he lived in Flushing, New York, and alleged that he had no regular contact with either Rockville, Maryland, or Teppanyaki Grill. Li Lin's opposition was virtually identical.

## Mr. Chen's Deposition

Mr. Chen was 26 years old (DOB: 12/12/1990) at the time of his deposition on October 16, 2017. Because Mr. Chen refused to appear at trial, his deposition testimony was ultimately admitted in its entirety. Mr. Chen testified in his deposition that, when he moved to Maryland, his first job was working at another restaurant in Laurel, also called Teppanyaki Grill. He claimed that this restaurant was also owned by Appellant and Li Lin, and that both father and son visited the Laurel Teppanyaki Grill once a month while he worked there.

Mr. Chen related that, while he was the manager of the Laurel Teppanyaki Grill, he had to consult with Appellant and Li Lin before he set the rate of pay for new employees and before he fired anyone. He also said that the Lins would determine the hours the employees worked, and that he did not know how the income for the Laurel business was handled but that the Lins would collect the money when they came to visit. Mr. Chen testified that, after managing the Laurel restaurant for 10 months, the Lins asked him to start a new business with them. After he informed them that he didn't have any money to invest, they told him he could simply manage the Teppanyaki Grill in Rockville. He testified that the Lins then raised his salary from $2,800 to $3,000 a month.

5

Once the Rockville business was open, Mr. Chen was charged with hiring new employees, but he had to call Li Lin to determine how much to pay them. Mr. Chen testified that he did not sign the business's incorporation paperwork that bears his name and signature.[5] He only realized that he was listed as the business owner when he started receiving business tax forms. After he found out in February of 2017 that all of the incorporation paperwork was in his name, he quit. Teppanyaki Grill closed a short time later. Mr. Chen testified that he had not seen the SDAT incorporation document prior to his deposition.

Mr. Chen acknowledged that, during the time he managed Rockville Teppanyaki Grill, he was responsible for hiring the front-of-house staff and deciding which employee would do each job. He clarified, however, that kitchen staff was not his responsibility, and that when bills came to the restaurant, he would call Li Lin and let him know before writing a check. Mr. Chen also had to let Li Lin know before he fired anyone.

According to Mr. Chen, when the Lins came to Teppanyaki Grill in Rockville, they were often upset because the business was not making enough money. Li Lin came to the restaurant once a month to collect sales records. At one point, Li Lin instructed Mr. Chen to open a business bank account for Teppanyaki Grill. Counsel for the Lins elicited testimony from Mr. Chen that the Lins' names do not appear on any of the business

---

[5] A document entitled, "Articles of Incorporation for a Stock Corporation," naming "Teppanyaki Gill & Supreme Buffe[sic], Inc.," was filed with SDAT on January 31, 2014. The Articles list the address of Teppanyaki Grill and state that the purpose of the corporation is "to engage in food service business." Both the incorporator and the resident agent signature boxes are signed "Weiguang Chen." The Articles designated one director: "Weiguang Chen."

6

accounts for Teppanyaki Grill. Mr. Chen also admitted that he had never seen either of the Lins hire an employee for Teppanyaki Grill directly.

All of the front staff were paid in cash, and their work hours were not recorded. Mr. Chen testified, however, that he did not know the Employees in this case or how they were paid because they were kitchen staff, and he only managed the front-of-house employees.

### The Lease Agreements

Central to the issues presented at trial was the lease agreement, and two amendments thereto, for the commercial restaurant space. The lease agreement is a 29-page-document, plus exhibits, that sets forth the terms of the lease. The first page confirms that it is an agreement between "Washington Real Estate Investment Trust ('Landlord')" and "Qun Lin, an individual ('Tenant'), d/b/a Flaming Grill Buffet." Appellant signed the lease on September 30, 2013. The term of the lease was 10 years and six months, and the parties anticipated it would commence on January 1, 2014.

The fixed minimum rent was $23,375.00 per month and the lease contained an escalation clause that increased the rent by 1.5% each year. By signing the lease, Appellant agreed to send a statement of gross sales to the landlord each month. He also agreed to pay 7.27% of the real estate taxes on the property. Under "Permitted Use" the lease provides: "Tenant will use and occupy the Premises solely for the following express use(s) and purpose(s) and for no other use or purposes: sit down Asian buffet restaurant serving items generally consistent with the menu items attached hereto as Exhibit 'E', and for no other purpose[.]" Section 5.3 of the Lease, entitled "Operation of Business" states, in part, that "Tenant agrees (1) except as herein otherwise provided, to continuously and

7

uninterruptedly occupy and use the entire Premises during the entire Term and any Renewal Term(s) for the uses herein specified (without consideration of the profitability of the business) and to conduct Tenant's business therein in a reputable manner[.]" Article IX of the Lease sets forth detailed provisions governing assignment and subletting, beginning with the specification that "Tenant shall not assign this Lease or any of Tenant's rights or obligations hereunder, or sublet or permit anyone to occupy the Premises or any part thereof, without the prior written consent of Landlord which shall not be unreasonably withheld, conditioned or delayed."

The First Amendment to the lease was signed by Appellant on April 23, 2014. The amendment changed Tenant's trade name from "Flaming Grill Buffet" to "Teppanyaki Grill and Supreme Buffet." It also amended other provisions of the lease not relevant to this appeal, including the date by which the landlord was required to deliver the Premises.

The second amendment to the lease was also an assignment of the lease. It was signed by Appellant on July 25, 2017. It assigned the lease from "Qun Lin, an individual dba Teppanyaki Grill and Supreme Buffet" to "Rock Hot Pot & BBQ, Inc., a Maryland corporation, dba Kpot Hot Pot & BBQ." Appellant signed as the assignor and on behalf of the assignee.

**Trial**

The case was tried to the court, beginning on June 5, 2018. At the start of the trial, counsel for the Lins noted that Mr. Chen was not present in the courtroom. Apparently, Mr. Chen advised counsel for the Employees that he was in Florida and that he did not intend to return for trial. He did not disclose what part of Florida he was in. Employees'

8

counsel requested that the court find Mr. Chen in contempt and issue a warrant for his arrest, or, in the alternative, allow counsel to read Mr. Chen's deposition testimony into evidence. Ultimately, in lieu of issuing the warrant, the court accepted Mr. Chen's deposition testimony upon the agreement of the parties present. A default order having been entered against the Teppanyaki Grill on September 18, 2017, and with Mr. Chen failing to appear, trial proceeded against the remaining defendants—Appellant and his son, Li Lin.

Jose Reyes Cruz, Jesus Emmanuel Sanchez Vasquez, and Clemente Garcia Martinez testified to the details of their employment at Teppanyaki Grill. They all identified the manager as a man named Ray, and none were able to identify Appellant or Li Lin. They each claimed they were hired, fired, and paid by the man named Ray.

Each Employee testified to the hours he worked and wage he was paid. For example, Mr. Cruz testified that he worked at Teppanyaki Grill from June 17, 2015 until October 12, 2016. During that time, he worked 12 hours per day, six days per week. He was paid in cash every 15 days and was never paid overtime. His starting pay was $1,700 per pay period but was eventually increased to $1,750 and then $1,800. Mr. Vasquez similarly testified that he worked 73 hours per week during his time as an employee of Teppanyaki Grill. He was paid between $1,600 and $2,000 per month in cash and was never paid overtime. Lastly, Mr. Martinez testified that he worked at Teppanyaki Grill for almost four years and was never paid overtime wages. He worked 74 hours per week during his time there and was paid $1,800 per month to start and made $2,000 per month by the time he was let go.

9

Robert Goldman, Esq., also testified in the Employees' case. He represented Teppanyaki Grill in 2017 "in negotiating or trying to renegotiate its lease with Washington Real Estate Investment Trust." Throughout the course of his representation, he interacted with both Li Lin and Ray Chen. He explained that the purpose of his representation was to assign the lease from Teppanyaki Grill to a new entity, a Hot Pot restaurant. When asked who owned Teppanyaki Grill, Mr. Goldman said that he initially thought that Mr. Chen was the owner, but that when he began representing Mr. Chen in the instant case, Mr. Chen executed interrogatories indicating that the Lins were owners. On cross-examination, Mr. Goldman testified that he had never seen any proof that Li Lin owned Teppanyaki Grill, and Li Lin had never made any such representations to him. He also testified that the documents filed with SDAT list Mr. Chen as the owner.

After having his memory refreshed, Mr. Goldman testified on redirect that the initial lease of the premises was to "Qun Lin, DBA Flaming Grill Buffet[.]" In response to questioning by the court, Mr. Goldman explained that he had communicated with Li Lin via email during the negotiations but that he had never communicated with Appellant.

Next, the Employees called Appellant. He did not speak, read, or write English and testified with the help of an interpreter. He acknowledged that he was the tenant on the lease for Teppanyaki Grill. He stated that, although his signature was on the amendment to the lease, he did not execute the amendment. He said that it was all done by lawyers, and he was not clear whether there was a subsequent amendment either. He also testified

that he did not recall assigning the lease to Kpot Hot Pot & BBQ[6] and that he was not the owner of that restaurant either. The Employees' counsel then questioned Appellant regarding a document that listed him as the "secretary, or assistant secretary, general partner and authorized person for Rock Hot Pot & BBQ, Inc." doing business as Kpot.

When asked about his occupation, Appellant responded that he was in the restaurant business, but he was not involved with any other restaurants known as "K-Pot." The Employees' counsel questioned Appellant regarding his involvement with a Kpot Hot Pot & BBQ in Gaithersburg. He replied that "all [he] did was sign the lease[]" and he didn't know anything about Kpot Hot Pot.[7]

---

[6] Kpot Hot Pot & BBQ is the trade name for Rock Hot Pot & BBQ, Inc.—the Maryland corporation that was the assignee of the Second Amendment to Lease. The record includes a separate "Assignment of Lease and Landlord's Consent" executed by Appellant.

[7] When questioned about his name being listed as an agent for a "K-Pot" restaurant in Connecticut, Appellant similarly denied any knowledge. When asked about another "K-Pot" restaurant in New Jersey, Appellant testified that he used to own two restaurants in New Jersey but they were sold. He then backtracked, however, and claimed he did not own any restaurants in New Jersey:

| [COUNSEL]: | Okay, but you did own it[?] |
|---|---|
| [QUN LIN]: | Yes, oh, no, I didn't own it, I was a partner. |
| [COUNSEL]: | Well, isn't a partner an owner of a restaurant? |
| [QUN LIN]: | It's a partner in the restaurant. |
| [COUNSEL]: | Okay and as a partner, did you own a piece of that restaurant? |
| [QUN LIN]: | I was working there. |
| [COUNSEL]: | Did you own that restaurant? |
| [QUN LIN]: | No, I didn't own it. I was in partnership with it. |
| [COUNSEL]: | Did you own a portion of that restaurant? |
| [QUN LIN]: | Yes. |

. . .

11

On cross-examination, Appellant testified that he did not own Teppanyaki Grill, that he did not recognize any of the Employees who were in the courtroom, and that he never hired or fired any of them. He also said that he did not manage or operate the restaurant and had not filed any tax returns for it.

Li Lin testified next, asserting at the outset that he did not own the "K-Pot" restaurant that was going in the space once occupied by Teppanyaki Grill. He said that his father helped Mr. Chen by leasing the space because Mr. Chen's whole family came to his father's house to ask for help. Li Lin testified that his wife's sister was married to Mr. Chen's brother. Li Lin's wife was from the same village in China as Mr. Chen.

The Employees' counsel questioned Li Lin about a sum of money that he gave to Teppanyaki Grill. He testified that it was not a loan, but that he provided them with a small amount of money when they were unable to pay the rent. He said he gave them $20,000 to pay the rent because he was worried that, if he did not, it would harm his father's reputation. He testified that some years he would visit Teppanyaki Grill once or twice and

---

| [COUNSEL]: | So, I will ask you again, do you own a K-Pot Restaurant in New Jersey? |
|---|---|
| [QUN LIN]: | No. |
| . . . | |
| [COUNSEL]: | Do you have any involvement with any K-Pot Restaurants in New Jersey? |
| [QUN LIN]: | No. |
| . . . | |
| [COUNSEL]: | Do you have any idea why you might be listed as a registered agent for a K-Pot restaurant in New Jersey? |
| [QUN LIN]: | I don't know. |

12

some years he would not visit at all. But, he insisted, he went there for a meal every time he visited Maryland, because Mr. Chen was his friend.

Li Lin admitted that he incorporated Rock Hot Pot & BBQ, Inc. He explained, however, that the hot pot restaurant was owned by a man named John Ling. He said that he initially transferred the business to his father and then his father transferred it to John Ling. Li Lin testified on cross-examination that he did not own Teppanyaki Grill and that, as far as he knew, Mr. Chen was responsible for hiring and firing the employees there. He testified that he did not recognize any of the Employees present in the courtroom.

After the Employees' motion for judgment was denied, the Lins' attorney recalled Li Lin to the stand. He testified that there were no agreements between himself and Mr. Chen and that he had no interest in Teppanyaki Grill. On cross-examination he admitted once again that he and his father helped Mr. Chen with the lease but insisted that they did not make any agreements with Mr. Chen. He also testified that Mr. Chen called him sometime in 2017 and informed him that the business was not doing well so he was not paying the rent. Then the landlord contacted him to tell him that Teppanyaki Grill was not paying the rent, so he paid $20,000 toward the rent.

The defense recalled Mr. Martinez, Mr. Sanchez, and Mr. Reyes Cruz. All three identified Mr. Chen from his driver's license photo,[8] and testified that Mr. Chen was the manager of Teppanyaki Grill who hired them, paid them, and eventually fired them. They all similarly testified that they had never met the Lins.

---

[8] Mr. Martinez initially had trouble identifying Mr. Chen.

13

During closing arguments, the court questioned why a person would incur $2.8 million in potential liability, as Appellant did, just to help a distant family member.

## Circuit Court Ruling

Almost two months later, on July 27, 2018, after the parties submitted post-trial memoranda, the judge delivered an oral ruling. He restated the pertinent facts, including that Appellant signed a lease with the Washington Real Estate Investment Trust. Rent for the commercial space started at $280,500 per year and included an escalation clause for each year. The lease also required the tenant to pay a portion of the real estate taxes as well as arrange for and pay the utilities. The judge noted that, in addition to signing the lease, Appellant signed an amendment to the lease that said, "tenant will conduct business on the premises in the trade name of Teppanyaki Grill & Supreme Buffet." Then, the court observed that Appellant, "as tenant and Washington Real Estate Investment Trust as landlord and Rock Hot Pot and BBQ Inc, signed a document titled . . . second amendment [to] lease, and assignment of lease and landlord's consent." That document included the language "Qun Lin . . . an individual doing business as Teppanyaki Grill & Supreme Buffet."

The judge then detailed his findings regarding the hours that each Employee worked while employed by Teppanyaki Grill. For example, he found that Jesus Emmanuel Sanchez Vasquez worked at Teppanyaki Grill from January 25, 2015 through January 1, 2017. He worked from 10 a.m. to 10 p.m. on weekdays, and 10 a.m. to 11 p.m. on weekends and was paid a total of $35,800 during the almost two years that he worked there.

In calculating the amount each Employee was owed, he explained that there were periods of time for which each Employee should have received "time and a half"[9] but did not.

The judge also found that Mr. Chen worked at Teppanyaki Grill, and that, based on his driver's license, he was 22 years old at the time Appellant claims to have signed the lease to help him open a business. He asserted, however, that he relied primarily upon the lease and the two amendments thereto in deciding that "the [Employees] ha[d] met their burden that [Appellant] was the owner of the business during the time period the [Employees] . . . worked at the Teppanyaki Grill & Supreme Buffet." The judge explained that he "simply d[id] not find it plausible that someone would risk the financial exposure created in the lease to help out someone who was just 22 years of age." Appellant "held himself out to be the owner of the business at the premises to the landlord[.]" The judge further noted that "[i]f [Appellant] was just a guarantor on the lease on behalf of Mr. Chen, as he argued, then the documents regarding that type of arrangement could have been made and prepared." The judge also determined that the Employees had met their burden of showing that they were not paid minimum wage or overtime but confined the ruling to the three Employees who were present in court and testified.

The judge did not "believe that there was sufficient evidence to show that [Li] Lin was an owner of the property." To do so, the court said, "would require me to accept the deposition testimony of Mr. Chen." Because Mr. Chen did not appear before the court so

---

[9] As explained further below, under the FLSA and the MWHL employers are required to "pay an overtime wage of at least 1.5 times the usual hourly wage[.]" LE § 3-415. This is sometimes referred to as "time and a half."

15

that his credibility might be assessed, the judge declined to rely on his testimony for this point. The judge explained that, while Li Lin admitted to paying $20,000 towards Teppanyaki Grill's back rent, this could be viewed as a payment on behalf of his father instead of a payment by the owner. "As for Mr. Chen's exposure in this matter," the judge stated that he did not believe the Employees had demonstrated that he had the wherewithal and authority to hire and fire. "There was no evidence presented by the [Employees] to show that." The judge noted that Mr. Chen testified in his deposition that he did not have the authority to hire or fire anyone. Lastly, "pursuant to the default order, liability against the corporation ha[d] been established[.]"

The court then explained how it arrived at its damage award, based on Employees' testimony regarding their work hours and rates of pay. The court determined that, because there was no bona fide dispute regarding whether the Employees were properly paid, treble damages were appropriate. The court reserved on the issue of attorney's fees.

Following Employees' motion for award of attorney's fees and costs, the court entered a separate Opinion and Final Order on November 2, 2018. In it, the court "denied all requests for relief against Defendant Chen and Defendant Li Lin, finding insufficient evidence to show they were owners." The court ordered that "[Appellant] and Teppanyaki Grill and Supreme Buffet, Inc. are jointly and severally liable to" [] Cruz in the amount of $66,939.60, [] Sanchez Vasquez in the amount of $148,587.58, and [] Garcia Martinez in the amount of $173,844.15. The court found that Appellant did not have a good faith basis for withholding wages from the Employees and his defense of the claim did not qualify as a "bona fide dispute" under the relevant statutes and case law. Thus, an award of

16

reasonable attorneys' fees—in this case, $47,186.50—was appropriate. These judgments were entered on the docket on November 2, 2018. Appellant noted a timely appeal.

## DISCUSSION

### Standard of Review

On appeal of a non-jury action, we review the trial court's legal conclusions de novo and its evidentiary findings for clear error, giving "due regard to the opportunity of the trial court to judge the character of the witnesses." Md. Rule 8–131(c); *Cunningham v. Feinberg*, 441 Md. 310, 322 (2015). "The determination of whether a defendant qualifies as an employer presents a mixed question of law and fact." *Pinnacle Grp., LLC v. Kelly*, 235 Md. App. 436, 471-72 (2018), *cert. denied sub nom. Pinnacle Grp. v. Kelly*, 459 Md. 188 (2018). "Although the ultimate conclusion is a question of law on which we grant the circuit court no deference, the analysis includes several factual determinations on which we must defer to the circuit court's findings unless clearly erroneous." *Id.* We "must consider evidence that [wa]s produced at the trial in a light most favorable to the prevailing party, and, if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous, and cannot be disturbed." *Pettiford v. Next Generation Tr. Serv.*, 467 Md. 624, 639 (2020).

### I.

### Testimony

Appellant argues that, while the trial court has discretion to decide what evidence to credit and what to reject, the trial court cannot reject certain parts of Mr. Chen's

deposition testimony but credit others. He points out that the trial court was incredulous about parts of Mr. Chen's testimony; as, for example, when the judge said "So, without more and again, I cannot rely upon Mr. Chen's testimony with regards to that point[.]" Appellant then notes one of the judge's "flip flops" when he said ". . . to the extent I look at Mr. Chen's testimony and rely upon it, he did testify at the deposition that he didn't have the authority to hire or fire." According to Appellant, the court should have rejected the deposition testimony as a whole, and it was "reversible error" for the court to rely upon a portion of the testimony to rebut the testimony of live witnesses.

The Employees respond that while the court only credited certain portions of Mr. Chen's testimony, it did not rely on his testimony for its conclusion that Appellant was the business owner. The Employees note that "[w]hile the trial judge's oral opinion does place some reliance on Chen's deposition testimony, it is only to the extent that the testimony relates to Mr. Chen." Additionally, the Employees assert that Appellant cannot now complain about the court relying on testimony that it wanted admitted in the first place.

As stated above, upon reviewing the circuit court's ruling in a bench trial, we must give due regard to the credibility determinations of the trial judge. *Pettiford v. Next Generation Tr. Serv.*, 467 Md. 624, 639 (2020). We must also consider the evidence presented at trial in the light most favorable to the Employees. *Id.*

The Employees' last contention is where we begin our analysis. Appellant's argument was not presented to the court and is contrary to Appellant's insistence, at trial, that Mr. Chen's entire deposition be admitted because "it is relevant." *Cf. Corapcioglu v. Roosevelt*, 170 Md. App. 572, 590 (2006) ("To begin, [the appellant] is precluded from

18

contending on appeal that the court erred by treating [the appellee's] motion as one for attorney's fees and costs because that contention is diametrically opposed to the position he argued below."); *see also* Md. Rule 8-131 ("Ordinarily the appellate court will not decide [an] issue unless it plainly appears to have been raised in or decided by the trial court.").

Regardless, Appellant has not produced, and we have not found, any support for the proposition that a factfinder may not credit or discredit only part of a witness's deposition testimony, but must instead, either credit or discredit the deposition testimony in its entirety. When weighing the credibility of witnesses and resolving conflicts in the evidence, "the fact-finder has the discretion to decide which evidence to credit and which to reject." *Hollingsworth & Vose Co. v. Connor*, 136 Md. App. 91, 136, (2000); *see also Santiago v. State*, 458 Md. 140, 156–57 (2018) ("[T]he fact finder 'may believe or disbelieve, credit or disregard, any evidence introduced, and a reviewing court may not decide on appeal how much weight must be given to each item of evidence'") (citing *Great Coastal Express, Inc. v. Schruefer*, 34 Md. App. 706, 725 (1977)). "In this regard, it may believe part of a particular witness's testimony but disbelieve other parts." *Id.* Mr. Chen's deposition testimony was admitted, in its entirety, as a joint exhibit. Appellant had the opportunity to object to the admission of the entire deposition at trial, and to cross-examine Mr. Chen at his deposition. We hold that the trial judge, in performing his role as factfinder, did not err when he credited certain parts of Mr. Chen's deposition testimony and disbelieved others. *See Hollingsworth & Vose Co.,* 136 Md. App. at 136.

## II.

## Restaurant Ownership

## Parties' Contentions

Appellant argues that the trial judge abused his discretion when he determined that Appellant was the owner and operator of Teppanyaki Grill, based largely upon the fact that he signed the lease for the property. Appellant contends that there was credible evidence from Li Lin and Mr. Chen's attorney, Mr. Goldman, that Mr. Chen owned the business. He points out that even the Employees' testimony—that Appellant never hired, fired, or paid any of them—supports his claim.

According to Appellant, the trial court misapplied the economic reality test by relying solely on the lease to find Appellant was the employer. He insists that "absent indicia of control under the four factor test," the lease agreement was not conclusive proof that he controlled the business. He also notes that the judge ignored evidence that it was Mr. Chen who hired the Employees, fired them, and paid their wages, and that none of the Employees testified that Appellant had any operational capacity at Teppanyaki Grill.

The Employees respond that the trial court relied on more than just the fact that Appellant's name was on the lease when it determined that he was the owner of Teppanyaki Grill. They assert that the court's decision was based on the lease, the two amendments to the lease, and what the court saw as "the implausibility of Appellant's own testimony." The Employees point out that the lease specifically stated that Appellant intended to use the premises to operate a sit-down Asian buffet. Additionally, they note that Appellant's

son gave the business $20,000 when it was having financial troubles. Lastly, they highlight the fact that the court simply did not believe that someone would sign such a financially risky lease for a distant relative.

The Employees contend that the trial court found Appellant liable as the sole proprietor of the business. Accordingly, they argue that when a person is deemed to be the sole proprietor of a business, the court does not need to apply the economic reality test to determine that the person is an employer under the FLSA. To support this theory, the Employees claim that the trial court pierced the corporate veil because Teppanyaki Grill was a sham corporation and failed to observe corporate formalities. And they argue, even if the trial court had determined that Appellant was the owner under the economic reality test, it would not have abused its discretion in doing so.

We cannot discern from the court's ruling what theory the court applied to find Appellant personally liable for the unpaid wages. The judge did not expressly apply the four factors of the economic reality test, although the judge may have indirectly referenced the economic reality test in determining that Mr. Chen was not the owner because "there[] [was] no evidence in front of [it] that Mr. Chen could hire and fire employees[.]"

The Employees' contention that the court deemed Appellant a sole proprietor fares no better on this record. The judge stated that Appellant "held himself out to be the owner of the business at the premises to the landlord, and I believe he was the owner." Acting as factfinder, the judge was certainly free to discredit Appellant's testimony that he signed the lease solely for the purpose of helping Mr. Chen open a business. The court was similarly free to credit or discredit Mr. Goldman's testimony. But the judge's thorough

21

explanation of how he arrived at certain factual findings was untethered to any of the legal principles the parties now contend they support.

The record does not show that the circuit court analyzed whether Appellant met the criteria of an employer under the relevant legal standards. As to each theory of liability, whether under the economic reality test or as a sole proprietorship, the court failed to make some of the necessary findings. It is not the role of this Court to make the necessary factual findings, but we set forth some relevant principles of law to guide the circuit court on remand.

**Wage Payment Laws**

Congress enacted the FLSA to protect "'the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others.' It is 'remedial and humanitarian in purpose' and 'should be broadly interpreted and applied to effectuate its goals.'" *Ross v. Wolf Fire Prot., Inc.*, 799 F. Supp. 2d 518, 522-23 (D. Md. 2011) (citing *Benshoff v. City of Virginia Beach,* 180 F.3d 136, 140 (4th Cir. 1999)). "Maryland allows employees to recover wages withheld unlawfully from them by their employers under two statutes: the Maryland Wage Payment and Collection Law ('MWPCL') and the Maryland Wage and Hour Law ('MWHL')." *Cunningham v. Feinberg*, 441 Md. 310, 322 (2015). The MWHL is the state equivalent to the Fair Labor Standards Act. *Newell v. Runnels*, 407 Md. 578, 649 (2009).

Both the FLSA and the MWHL require, among other things, that an employer "pay an overtime wage of at least 1.5 times the usual hourly wage for each hour over 40 that

[an] employee works during one workweek."[10]  *Id.* (citation omitted).  The MWPCL "does not concern the amount of wages payable but rather the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment." *Friolo v. Frankel*, 373 Md. 501, 513 (2003).

## Who is an Employer?

Each of the assorted wage and hour statutes contains a vague definition for the term employer.[11]  The Court of Appeals has explained that, in the context of these statutes, the term "is not limited by the common law concept of 'employer,' and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes." *Newell*, 407 Md. at 649-50 (citation omitted).  "Accordingly, an employee may have more than one employer at a given time." *Id.*

---

[10] The MCMWA sets the minimum wage for Montgomery County and requires that employers pay their employees the highest wage required from among the FLSA, the MWHL, and the MCMWA.  Chapter 27, Article XI, Sec. 27-68 of the Montgomery County Code.

[11] *See* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization."); *see also* LE § 3-401 ("(b) 'Employer' includes a person who acts directly or indirectly in the interest of another employer with an employee."); *see also* LE § 3-501 ("(b) 'Employer' includes any person who employs an individual in the State or a successor of the person."); *see also* Chapter 27, Article XI, Sec. 27-67 of the Montgomery County Code ("Employer means any person, individual, proprietorship, partnership, joint venture, corporation, limited liability company, trust, association, or other entity operating and doing business in the County that employs 1 or more persons in the County in addition to the owners. Employer includes the County government, but does not include the United States, any State or any other local government.").

There is generally a consensus among the federal circuits that a company's owners, officers, or other supervisory personnel may be held individually liable for FLSA violations, regardless of whether they have chosen to do business in the corporate form.[12] *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 153 (3d Cir. 2014); *Manning v. Boston Medical Ctr. Corp.*, 725 F.3d 34, 47 (1st Cir. 2013); *Lambert v. Ackerly*, 180 F.3d 997, 1011-12 (9th Cir. 1999). Thus, at the federal level at least, it is unnecessary to pierce the corporate veil to find individuals within a corporation personally liable for violations of the FLSA.[13] *See Donovan v. Agnew*, 712 F.2d 1509, 1511-12 (1st Cir. 1983) ("The

---

[12] The FLSA is somewhat unique in this regard. As one commentator put it:

> The issue of liability of individuals as employers may seem counterintuitive at first since individuals, in most cases, are not personally liable for the actions of the corporation and the individuals who may face liability as employers are employees themselves. Like so many areas of the law, the answer to the legal question whether an individual can be held liable as an employer is complex and the real answer is that "it depends." Depends upon what? It depends on the language and the intent of the employment statute at issue.

Mitchell H. Rubinstein, *EMPLOYEES, EMPLOYERS, AND QUASI-EMPLOYERS: AN ANALYSIS OF EMPLOYEES AND EMPLOYERS WHO OPERATE IN THE BORDERLAND BETWEEN AN EMPLOYER-AND-EMPLOYEE RELATIONSHIP*, 14 U. PA. J. BUS. L. 605, 653-54 (2012) (explaining that there is no supervisory liability under Title VII, the Americans with Disabilities Act or the Age Discrimination in Employment Act).

[13] Around the country, states are split on whether to allow individual or supervisory liability for claims brought under their own employment laws. *Compare Hill v. Ford Motor Co.*, 277 S.W.3d 659, 669 (Mo. 2009) ("[T]he plain and unambiguous language within the definition of 'employer' under the M[issouri Human Rights Act] imposes individual liability in the event of discriminatory conduct.") *and Butler v. Hartford Tech. Inst., Inc.*, 704 A.2d 222, 227 (Conn. 1997) ("[T]he term employer as used in [the statute] encompasses an individual who possesses the ultimate authority and control within a corporate employer to set the hours of employment and pay wages and therefore is the

overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."). On at least two occasions, this Court has considered claims against individuals for violations of Maryland's wage and hour laws, even though the individuals had sought to limit their exposure by forming limited liability companies. *See Pinnacle Grp. LLC,* 235 Md. App. at 445*; see also Campusano v. Lusitano Cont. LLC,* 208 Md. App. 29, 32-33 (2012).

To determine whether an individual qualifies as an employer under the FLSA, the MWHL, and the MWPCL, both Maryland and Federal courts apply the economic reality test.[14]  *Campusano*, 208 Md. App. at 37-38.  The economic reality test is sometimes

---

specific or exclusive cause of improperly failing to do so.") *with Boucher v. Shaw*, 196 P.3d 959, 963 (Nev. 2008) ("Because the Legislature has not unequivocally indicated its intent to equate managers with 'employers' . . . we conclude that individual management-level corporate employees . . . cannot be held liable as employers for the unpaid wages of employees under Nevada's wage and hour laws.").

[14] In *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 724 (1947), the Supreme Court first articulated the test when it considered an action to enjoin two meat processing companies from further violations of the FLSA. The Court rejected petitioners' argument that the workers were independent contractors because the operations of the meat processing plants "constitute[d] an integrated economic unit[.]"  Based on the history and purpose of the FLSA, the Court concluded that the relevant analysis to determine an employer was "not the common law test of control," but rather "the underlying economic realities" of the relationship. *Id.* at 726-27, 729.  The Supreme Court later clarified that the underlying economic realities of the worker's relationship with the employer are controlling, rather than any "technical concepts" used to characterize the relationship. *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961).  Consequently, courts analyze the totality of the circumstances, and not any one determinative factor, to determine whether an employment relationship exists. *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 676 (1st Cir. 1998).  To assess individual liability as an employer, the test focuses on the role the individual played in directing the corporation to undercompensate employees and prioritize "the payment of other obligations and/or the retention of profits.

referred to as the "economic realities test." *E.g.*, *Barfield v. N.Y.C. Health and Hosp. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008). "Economic reality test" appears to be the most commonly used title, as well as the one adopted by the Maryland Court of Appeals when it first applied the "economic reality test" in *Newell v. Runnels*, 407 Md. 578 (2009).[15]

The economic reality test for "control" examines "four factors to determine an individual's level of 'control' over an employee." *Pinnacle Group, LLC*, 235 Md. App. at 472-73. The factors are "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Campusano*, 208 Md. App. at 39-40 (quoting *Newell*, 407 Md. at 651). "The factors are 'not to be applied mechanistically, and their general purpose must be understood as ultimately assigning *responsibility* under the law.'" *Pinnacle Group, LLC*, 235 Md. App. at 473 (emphasis in original) (citation omitted).

---

In addition to direct evidence of such a role, other relevant indicia may exist as well—for example, an individual's operational control over significant aspects of the business and an individual's ownership interest in the business." *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998).

[15] The Court of Appeals first applied the "economic reality test" in *Newell v. Runnels*, 407 Md. 578 (2009). In doing so, it noted that the test "is fluid and often articulated differently by different courts." *Id.* at 651. The Court ultimately subscribed to the version of the test articulated by the Second Circuit in *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984). *Id.* The test encompasses the same four factors applied by this Court in *Campusano*. *Compare Campusano*, 208 Md App. at 39-40, *with Carter*, 735 F.2d at 12.

The U.S. Court of Appeals for the First Circuit "has explained that the four-factor analysis of control focuses 'on the role played by the corporate officers in *causing* the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits.'" *Campusano*, 208 Md. App. at 40 (quoting *Baystate Alternative Staffing v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998)). Other relevant indicia may also exist, such as, "an individual's operational control of the business and an individual's ownership interest in the business." *Id.* This Court noted, in *Pinnacle Group, LLC v. Kelly*, that being the sole owner of a company does not alone subject one to personal liability under the MWPCL. 235 Md. App. at 473. "Indeed, 'it is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer.'" *Id.* at 474 (citation omitted).

In *Campusano v. Lusitano Const. LLC*, the appellants, four employees of the company, sued Lusitano Construction, LLC, Geoffrey de Oliveira, and Francisco de Oliveira for alleged violations of the FLSA and MWPCL. 208 Md. App. at 32. Geoffrey was the sole owner of the construction company, and his father, Francisco, was employed there as a project supervisor. *Id.* at 33. The trial court entered judgment against Geoffrey and Lusitano, but not Francisco. *Id.* at 32. On appeal, we were asked to determine whether Francisco qualified as an employer under the FLSA and the MWPCL. *Id.* at 33. As a project supervisor, "Francisco set appellants' work schedule, assigned their tasks, managed supplies, maintained work logs, and 'occasionally' distributed paychecks drafted by Geoffrey or Lusitano Construction." *Id.* Francisco testified that he did not hire the appellants, and he did not set their wages. *Id.* Two of the appellants corroborated this

27

testimony. *Id.* We held that the "legislative intent to incentivize payment by responsible parties would not be served by holding that a supervisor such as Francisco was an "employer[.]" *Id.* at 40.

> Although Francisco supervised and controlled appellants' work schedules and conditions of employment, and although he maintained their work logs, these supervisory tasks are not sufficient to make him personally liable for appellants' wages, particularly where he had no ownership, control, or investment in the LLC that was appellants' formal employer.

*Id.*

Looking at the four factors, we noted that the trial court found that Francisco did not have the power to hire and fire employees or set their rates of pay. *Id.* at 40-41. There was very little evidence to the contrary and certainly less than the amount required to say the finding was clearly erroneous. *Id.* at 41. In its role as the fact finder, "the trial court was free to credit Francisco's testimony that he never paid wages personally[.]" *Id.* Additionally, appellants' paychecks "indisputably originated from Geoffrey." *Id.* Ultimately, we held that Francisco was not an employer for the purposes of the FLSA and MWPCL. *Id.* "Were we to hold otherwise, we would set the precedent that any manager who has some direction in hiring, wages, and other conditions of employment is *personally liable* for wages that the manager's own employer is unable or unwilling to pay." *Id.* (emphasis is original).

**Sole Proprietor Liability**

Generally, a finding that a person is the owner of a business does not automatically subject that person to personal liability under the wage payment statutes. *See Pinnacle Grp., LLC*, 235 Md. App. at 473. That's about as much as we can say on this point based

on our decisional law, which is sparse. We have only had occasion to apply this principle

to a case involving a business owner who was operating under the protection of an entity

that limited his personal liability.[16] *Id.* In *Pinnacle Grp., LLC*, we considered whether the

sole owner of Pinnacle Group, a limited liability company, could be subject to personal

liability under the MWHL and the MWPCL. *Id.* at 445. We affirmed the judgment of the

circuit court that the owner should be found liable under the economic reality test despite

---

[16] Although the sole owner of his business, the individual had formed a limited liability company, or an LLC. An LLC "is a form of business organization that has characteristics of both a partnership and a corporation. . . . Like shareholders of a corporation, . . . the members of an LLC have the shield of limited liability." *7222 Ambassador Rd., LLC v. Nat'l Ctr. on Institutions & Alternatives, Inc.*, __ Md. __, ___ No. 66, Sept. Term, 2019, slip op. at 2 (filed July 27, 2020). The Court of Appeals recently held, however, that "managing members of an LLC owe common law fiduciary duties to the LLC and to the other members based on principles of agency." *Plank v. Cherneski*, 469 Md. 548, 572 (2020). The Court described some of the unique characteristics of an LLC:

> An LLC is an unincorporated business organization. CA § 4A-101(k). The LLC Act was formed "to give the maximum effect to the principles of freedom of contract and to the enforceability of operating agreements." CA § 4A-102(a). An LLC is formed by an individual causing articles of organization to be executed and filed with the State Department of Assessments and Taxation. CA § 4A-202. The owners of the LLC are referred to as "members." CA § 4A-101(m). The members' relationship with one another, the affairs of the LLC, and the conduct of the LLC's business are governed by contract, defined as an "operating agreement." CA § 4A-101(p). The operating agreement adopted by the members addresses, *inter alia*, how the LLC "shall be managed, controlled, and operated"; the manner in which members share profits and losses; the manner in which new members may be admitted; procedures for assignment of membership interests; and meeting and voting procedures. CA § 4A-402(a)(1)-(8).

*Id.* at 570–71.

29

the form of the business. *Id.* at 484. The record in *Pinnacle Grp., LLC* established that the owner was the only person in the company with the authority to officially hire or fire employees and had "the final say" on employees' schedules and the daily operations of the organization. *Id.* at 474. We found the owner's argument that he had two full-time office employees who largely dealt with the hiring and firing unpersuasive, noting that the first factor of the economic reality test focuses on who has the *capacity* to hire or fire someone. *Id.* We also noted that the owner had "total control" over the employees' rate and method of payment and had the authority to maintain employment records. *Id*.

The Employees, understandably, rely on several federal cases to advance their argument that Appellant is liable as the sole proprietor of Teppanyaki Grill.

A sole proprietorship is a form of business that provides "complete identity of the business entity with the proprietor himself." *Bushey v. N. Assur. Co. of Am.*, 362 Md. 626, 637 (2001) (citation omitted). A business organized as such "has no legal existence apart from its owner[.]" *Id.* Consequently, a sole proprietor is personally liable for all debts and obligations of the sole proprietorship, whether arising out of contract or tort.[17] § 6:7.Entity forms—Sole proprietorships, 1 Handling Business Tort Cases § 6:7. Because the sole proprietor and the business share an identity, some courts have acknowledged that a sole proprietor will be liable for the business's violations of the FLSA. *See Teri v. Spinelli*, 980

---

[17] A number of law review articles extol the virtues of a form of limited liability sole proprietorship to avoid these liability consequences. *E.g.*, Mitchell F. Crusto, *UNCONSCIOUS CLASSISM: ENTITY EQUALITY FOR SOLE PROPRIETORS*, 11 U. PA. J. CONST. L. 215, 226 (2009).

F. Supp. 2d 366, 372 n.10 (E.D.N.Y 2013) ("[A]s a sole proprietor, [the defendant] is personally liable for debts arising out of his business conduct.").

Still, we note that the Employees' reliance on *Marshall v. Brunner*, 668 F.2d 748 (3d Cir. 1982), for this proposition, is misplaced. Although, in that case, the Third Circuit found the sole proprietor of the business personally liable for violations of the FLSA, we surmise that the only reason the court did not apply the economic reality test was because Brunner's status as an employer was not at issue in the case. *Id.* at 750. Brunner, instead, argued that the business and he were exempt from coverage under the FLSA entirely. *Id.* at 751.

As the Employees acknowledge, Teppanyaki Grill was organized as a corporation through articles of incorporation filed with SDAT. Therefore, as explained above, it would be necessary to apply the economic reality test in order to determine whether Appellant could be held individually liable as an employer; unless, perhaps, the corporate veil can be pierced to hold an individual accountable as owner of the company.

**Piercing the Corporate Veil**

Piercing the corporate veil is a tool that allows courts to disregard the corporate form and hold shareholders individually liable under certain circumstances. *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 306 (1999). The Court of Appeals has articulated the following scenarios for when a corporate entity will be disregarded:

> "*First.* Where the corporation is used *as a mere shield for the perpetration of a fraud,* the courts will disregard the fiction of separate corporate entity.

31

*Second.* The courts may consider a corporation as unencumbered by the fiction of corporate entity and deal with substance rather than form as though the corporation did not exist, *in order to prevent evasion of legal obligations.*

*Third.* Where the stockholders themselves, or a parent corporation owning the stock of a subsidiary corporation, *fail to observe the corporate entity, operating the business or dealing with the corporation's property as if it were their own,* the courts will also disregard the corporate entity for the protection of third persons."

*Hildreth v. Tidewater Equip. Co.*, *Inc.*, 378 Md. 724, 734 (2003) (emphasis in original).

"'Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporate veil.' In Maryland, we will disregard the corporate fiction only in instances of fraud or when necessary to 'enforce a paramount equity.'" *Stisser v. SP Bancorp, Inc.*, 234 Md. App. 593, 625 n.12 (2017) (citations omitted). "Because piercing the corporate veil is founded on equity, 'where no fraud is shown, the plaintiff must show that an inequitable result, involving fundamental unfairness, will result from a failure to disregard the corporate form.'" *Hildreth*, 378 Md. at 735 (citation omitted). The standard regarding enforcement of paramount equities is as follows:

> [W]hen substantial ownership of all the stock of a corporation in a single individual is combined with other factors clearly supporting disregard of the corporate fiction on grounds of fundamental equity and fairness, courts have experienced "little difficulty" and have shown no hesitancy in applying what is described as the "alter ego" or "instrumentality" theory in order to cast aside the corporate shield and to fasten liability on the individual stockholder.

*Travel Committee, Inc. v. Pan American World Airways, Inc.,* 91 Md.App. 123, 158–59 (1992) (quoting *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 685 (4th Cir.1976)). The factors used in analyzing whether a paramount equity should be enforced include, *inter alia,* "whether

32

the corporation was grossly undercapitalized, ... the dominant stockholder's siphoning of corporate funds, ... the absence of corporate records, and the corporation's status as a facade for the stockholders' operations." *Id.* at 159 (quoting *DeWitt,* 540 F.2d at 686–87).

*Residential Warranty Corp.*, 126 Md. App. at 307. Although Maryland courts have resisted piercing the corporate veil for reasons other than fraud, *id.*, the Court of Appeals has continued to affirm the validity of the paramount equity rationale. *Schlossberg v. Bell Builders Remodeling, Inc.,* 441 Md. 671, 672 (2015). The Court of Appeals has further noted that "with regard to the failure to adhere to corporate formalities, '[t]he 'alter ego' doctrine must . . . take account of close corporation laws, which commonly allow close corporations to elect not to have a board of directors and to have the corporation run directly by the stockholders.'" *Id.*

## Conclusion

It is unclear from the trial judge's opinion whether he found, as the Employees urge, that Appellant was operating the business as a sole proprietor. Although the Employees advance an argument for piercing the corporate veil, the judge's ruling is inconclusive as to whether he intended to disregard Teppanyaki Grill's corporate form and, if so, on what basis. The waters are further muddied by the fact that Teppanyaki Grill was set up as a corporation in Mr. Chen's name. Based on the SDAT documents, Mr. Chen was the sole owner and shareholder of Teppanyaki Grill.

On the other hand, the court may have intended to find that Appellant was an employer under the economic reality test to effectuate the FLSA's broad remedial purposes and hold Appellant accountable for the Employees' wages. If that is the case, then the

33

circuit court must apply the control factors of the economic reality test and explain its ruling under that theory of liability.

Accordingly, we vacate the judgment and order a limited remand so that the circuit court can, based on the evidentiary record already before the court, conduct further proceedings and render further factual findings under the appropriate theories of liability discussed in this opinion. *See Funes v. State*, ___Md. ___, No. 65, Sept. Term, 2019, slip op. at 31 (filed June 30, 2020) ("A limited remand is proper where the purposes of 'justice will be served by permitting further proceedings[.]'"(quoting Maryland Rule 8-604(d)(1))). We do not pass any judgment on the outcome of an appeal following the court's clarification of its reasoning.

**JUDGMENT AGAINST APPELLANT, QUN LIN, AND JUDGMENT GRANTING ATTORNEY'S FEES VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY TO CONDUCT FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. PARTIES TO PAY THEIR OWN COSTS.**